MICHAEL J. GABLEMAN, J.
¶ 1. Our Constitution obeys the "centuries-old principle of respect for the privacy of the home," Wilson v. Layne, 526 U.S. 603, 610 (1999), and the state therefore may not intrude into a residence without a warrant unless it satisfies one of the few and narrowly-drawn exceptions to the warrant requirement. Welsh v. Wisconsin, 466 U.S. 740, 749 (1984). One exception permits the police to enter the home when the prosecution can persuade a court that the officer was invited to cross the threshold by someone authorized by the defendant to extend such invitations. United States v. Matlock, 415 U.S. 164, 171 (1974). At issue now is whether Kristina Podella had *728 that authority when she invited law enforcement to enter Kenneth Sobczak's residence and view suspicious files on his computer. The circuit court found that she did have that authority and accordingly denied Sobczak's motion to suppress, and the court of appeals agreed. We agree with both the trial and appellate courts, and consequently affirm the decision of the court of appeals.
I. BACKGROUND
¶ 2. The relevant facts are undisputed and taken largely from the uncontroverted testimony offered at the suppression hearing. Sobczak and Podella met online and began dating in the summer of 2009.[1] In early-September 2009, approximately three months into their relationship, Sobczak was living at his parents' home in Hartford, Wisconsin and Podella was living in Kenosha. At Sobczak's invitation, Podella arrived at the Hartford residence on Friday, September *729 4, 2009 to spend the weekend while Sobczak's parents were away on vacation, planning to depart on Sunday, September 6. The afternoon of the following day, Sobczak reported to his bartending job, leaving Podella alone in the house. Because she had no means of transportation and was unfamiliar with the town, Podella asked and received permission from Sobczak to use his personal laptop to occupy herself in his absence.
¶ 3. While using the laptop, Podella encountered a video file that appeared to show underage girls engaging in sexual behavior. She further observed four or five other videos with file-names that suggested to her that they might contain child pornography, but she did not open any of them. Troubled by these discoveries, Podella called her grandmother and asked her to call the police, which the grandmother promptly did.
¶ 4. Officer Nathanial Dorn arrived at the scene shortly thereafter and Podella met him at the front door of the house. While standing on the porch, the two spoke for about ten minutes. During the course of that conversation, Podella conveyed her suspicions regarding the videos. To quote his uncontested testimony at the suppression hearing, Officer Dorn responded as follows:
So I asked her [sic] I'm going to need to view the video. I said we can either go inside and look at it, or you can bring it out here; whatever is more comfortable for you. She said, no, we can go inside and look at it. She [had been] sitting on the couch [with the laptop,] which she then pointed out, and I could see through the front door [that the couch] was a few feet inside, which was 20 feet inside the front door.
¶ 5. Officer Dorn then asked Podella if he could enter the residence and she answered in the affirmative. Once inside, Officer Dorn informed Podella, as he *730 later testified, that he would "have to look at the video to view it." Podella agreed to help him do so and found the video on the computer, which had been sitting on the couch throughout the encounter. Having located the video, Podella pressed play and Officer Dorn watched the video. Like Podella, Officer Dorn believed that the video contained child pornography, and he briefly inspected "a couple" of the other videos that had aroused Podella's suspicions. He thought that these too depicted child pornography and called his supervisor for guidance. Officer Dorn's supervisor instructed him to bring the laptop to the station, and he complied.
II. PROCEDURAL HISTORY
¶ 6. Sobczak was arrested and charged with possession of child pornography in Washington County Circuit Court. He filed a motion to suppress the evidence seized on the ground that it was taken in violation of his Fourth Amendment rights.[2] The circuit court, Faragher, J., denied the motion to suppress, concluding that Podella validly consented to Officer Dorn's entry and search.[3] In a unanimous, published opinion the court of appeals affirmed, reasoning that Podella "had actual authority to consent to the officer's entry into the house and to the search and seizure of *731 Sobczak's laptop." State v. Sobczak, 2012 WI App 6, ¶ 12, 338 Wis. 2d 410, 808 N.W.2d 730.
¶ 7. Explaining its decision, the panel wrote that "[wjhile a mere guest in a home may not ordinarily consent to a search of the premises, the analysis is different when the guest is more than a casual visitor but instead has 'the run of the house.'" Id. (quoting 4 Wayne R. LaFave, Search and Seizure, § 8.5(e) (4th ed. 2011). To resolve whether Podella had the run of the house in this sense, the court of appeals reviewed Podella's relationship with the house and the laptop, emphasizing that she was invited to stay at the house for the weekend and that Sobczak never contended that he placed any restrictions on her use of the property or the laptop while alone in the residence. Id. In light of those facts, the court determined that Podella did have the run of the house for Fourth Amendment purposes and "thus had authority to allow the officers to enter the residence and to search and seize Sobczak's computer." Id. However, the court took care to highlight the outer boundaries of its holding, noting that Podella's "authority to consent to a search was limited to the property that she possessed 'common authority' over," which here encompassed the living room into which she led Officer Dorn and the laptop she presented for his inspection. Id., ¶ 13.
¶ 8. We granted Sobczak's petition for review and now affirm.
III. STANDARD OF REVIEW
¶ 9. When ascertaining whether evidence should have been suppressed as the result of a Fourth Amendment violation, we are confronted with a mixed ques *732 tion of law and fact. State v. Buchanan, 2011 WI 49, ¶ 8, 334 Wis. 2d 379, 799 N.W.2d 775. First, the circuit court's findings of fact are taken as true unless clearly erroneous. State v. Sykes, 2005 WI 48, ¶ 12, 279 Wis. 2d 742, 695 N.W.2d 277. Second, our application of constitutional principles to those facts is de novo. State v. Vorburger, 2002 WI 105, ¶ 32, 255 Wis. 2d 537, 648 N.W.2d 829.
IV DISCUSSION
¶ 10. As we explain below, Podella had actual authority to consent to Officer Dorn's entry and search of the laptop. Sobczak's motion to suppress was therefore properly denied by the circuit court and that judgment in turn was properly affirmed by the court of appeals.
A. FOURTH AMENDMENT BACKGROUND PRINCIPLES
¶ 11. A cornerstone of our Bill of Rights, the Fourth Amendment to the United States Constitution forbids law enforcement from conducting "unreasonable searches and seizures."[4] The Fourth Amendment applies to state officers by virtue of its incorporation *733 through the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 655 (1961); State v. Hess, 2010 WI 82, ¶ 41, 327 Wis. 2d 524, 785 N.W.2d 568. It has long been established that the Fourth Amendment places the greatest protection around the home, as it was drafted in part to codify "the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." Payton v. New York, 445 U.S. 573, 601 (1980) (footnote omitted); Holt v. State, 17 Wis. 2d 468, 477, 117 N.W.2d 626 (1962) ("A home is entitled to special dignity and special sanctity."). Due to the constitutional sanctity of the home, the police may not venture across the threshold without a warrant except under limited circumstances, on pain of suppression. Kyllo v. United States, 533 U.S. 27, 31 (2001); State v. Pinkard, 2010 WI 81, ¶ 13, 327 Wis. 2d 346, 785 N.W.2d 592. One such exception — "jealously and carefully drawn" — "recognizes the validity of searches with the voluntary consent of an individual possessing authority." Georgia v. Randolph, 547 U.S. 103, 109 (2006) (internal quotation marks and citation omitted); see generally State v. McGovern, 77 Wis. 2d 203, 252 N.W.2d 365 (1977). In order to preserve the integrity of the warrant requirement, when the State seeks to admit evidence searched or seized without a warrant on grounds of lawful consent, it must prove, by clear and convincing evidence, that it obtained such consent. State v. Tomlinson, 2002 WI 91, ¶ 21, 254 Wis. 2d 502, 648 N.W.2d 367. As a factual matter, the parties agree that Podella consented to Officer Dorn's entry and search. They disagree as to whether the Fourth Amendment empowered her to offer such consent. As we show below, it did.
*734 B. WEEKEND GUESTS ARE NOT PER SE EXCLUDED FROM GRANTING THIRD-PARTY CONSENT TO ENTER A HOME AND CONDUCT A SEARCH THEREIN
¶ 12. The U.S. Supreme Court has recently reiterated that the Fourth "Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When the Government obtains information by physically intruding on... houses , a search within the original meaning of the Fourth Amendment has undoubtedly occurred." Florida v. Jardines, 569 U.S. _, 133 S. Ct. 1409, 1414 (2013) (internal quotation marks and citation omitted). It is undisputed here that the State acquired the incriminating evidence from the laptop "by physically intruding" into the home. If the officers so intruded in violation of the Fourth Amendment, then, the challenged evidence must be suppressed. See id. at 1417 ("That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred," and since the search was not justified under the Fourth Amendment the evidence seized was properly excluded). Thus the question for us is whether Officer Dorn had the constitutional authority to enter the home and search the laptop.[5] He did.
¶ 13. Sobczak's principal argument is that Podella could not have had actual authority to consent to Officer Dorn's entry to the house and living room because she was merely a weekend guest. In his view, *735 the exception set forth by Matlock is limited to "co-occupants" and "co-inhabitants," and does not cover those with shorter stays like Podella. Effectively, Sobczak asks us to draw a bright-line rule focused solely on the duration of the consenter's time in the residence. For several reasons, we decline to do so.
¶ 14. First, while it is true, as Sobczak points out, that the U.S. Supreme Court has used the terms "co-occupant" and "co-inhabitant" in articulating the third-party consent doctrine, see, e.g., Randolph, 547 U.S. at 109, 111, it has been careful not to require a slavish devotion to such titles. Instead, the court has cautioned that the analysis hinges not "upon the law of property, with its attendant historical and legal refinement. . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes . .. ." Matlock, 415 U.S. at 171 n.7; cf. Missouri v. McNeely, 569 U.S. __, 133 S. Ct. 1552, 1564 (2013) ("While the desire for a bright-line rule is understandable, the Fourth Amendment will not tolerate adoption of an overly broad categorical approach that would dilute the warrant requirement in a context where significant privacy interests are at stake."). Although Sobczak pays lip-service to this crucial footnote from Matlock, claiming that it supports his "commonsensical understanding" as to who possesses authority, his proposed approach flatly contradicts it. For what would a single-minded fixation on the often-blurry distinction between co-occupants, weekend guests, and so on be if not the type of overly formalistic property-law inquiry that the U.S. Supreme Court has expressly disavowed in this area?[6]
*736 ¶ 15. Resisting this inevitable conclusion, Sobczak insists that the strict weekend guest/co-occupant dichotomy he constructs to delineate who has authority to consent can be maintained within the more flexible framework established by the U.S. Supreme Court. As Sobczak acknowledges, the power to give consent turns on "widely shared social expectations" and "commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests." Randolph, 547 U.S. at 111. In other words, the exception is premised on the axiom that people who "share quarters .. . understand that any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in his absence by another." Id. Sobczak recognizes this language and seeks to turn it to his advantage, submitting that no such assumption of risk takes place when a *737 guest is invited to spend the weekend. We are aware of authority from other jurisdictions to that effect, see, e.g., People v. Pickens, 655 N.E.2d 1206, 1209 (Ill. Ct. App. 1995), but viewed in relation to the reasoning of the U.S. Supreme Court's binding case law we think it conceptually unsound.
¶ 16. Human nature being what it is, most members of society do not ground their expectations regarding the potential behavior of guests on formal titles like "co-occupant" and "weekend guest," divorced from all context. Cf. State v. Kieffer, 217 Wis. 2d 531, 544, 577 N.W.2d 352 (1998) (stressing that the familial relationship of the consenter to the defendant is one nondispositive factor among others). Nor should they, as not all "weekend guests" are created equal. As counsel for the State astutely noted at oral argument, a college student home for the weekend enjoys a very different status than a casual acquaintance left momentarily at a home while the owner runs an errand. It would be absurd to sanction a police officer for entering a home after being let in by a college student who had spent, say, 18 of his 20 years living at the residence solely because he was, at that particular time, merely a "weekend guest." Society is not so irrational.[7]
*738 ¶ 17. The only binding authority that is arguably at odds with our conclusion is Illinois v. Rodriguez, 497 U.S. 177 (1990). There, the U.S. Supreme Court reviewed a case in which a woman named Gail Fischer had lived with the defendant for several months but left almost a month before the challenged search, taking her children's clothing with her but leaving behind various pieces of furniture and other objects. Id. at 181. After moving out, Fischer occasionally stayed overnight at the defendant's apartment, to which she had a key, though she did not invite friends, did not go when he was not there, did not have her name on the lease, and did not contribute to the rent. Id. In a cursory two sentences,[8] the court dismissed the possibility that Fischer had actual authority to consent to a search of the apartment, calling the lower court's rejection of that assertion "obviously correct." Id. at 181-82.
¶ 18. Sobczak reasonably regards this passage as most helpful to his cause, seeing as how Fischer was in some senses more closely associated with the searched premises than was Podella, as she had lived there in the past, had left belongings there, and had a key.[9] Id. It is an argument with some persuasive force. In the final *739 analysis, however, we must follow the underlying logic of the Supreme Court in its definitive pronouncement on the subject, not a passing remark in an opinion almost entirely devoted to other issues.[10] Matlock is the law on actual authority in third-party consent cases, and Mat-lock directs us to consider the "widely shared social expectations" and "commonly held understanding" that give rise to an assumption of risk that an individual in one's domicile may admit others. As we have explained, such considerations are incompatible with a blanket refusal to grant some weekend guests the authority to consent.[11]
*740 ¶ 19. In sum, as with most search-and-seizure cases, the question of whether law enforcement acted reasonably within the meaning of the Constitution here depends not upon the application of a rigid rule like the one Sobczak proposes, but upon "the peculiar facts and circumstances" of the case. State v. Pires, 55 Wis. 2d 597, 609, 201 N.W.2d 153 (1972) (footnote omitted); see also McNeely, 133 S. Ct. at 1564 ("[A] case-by-case approach is hardly unique within our Fourth Amendment jurisprudence. Numerous police actions are judged based on fact-intensive, totality of the circumstances analyses rather than according to categorical rules . . . ."). With respect to third-party consent, there are certain types of "peculiar facts and circumstance" that deserve special attention. The Matlock court explained that what grants authority to a third party to consent is "common authority over or other sufficient relationship to the premises or effects sought to be inspected." 415 U.S. at 171 (footnote omitted). It follows that the courts must explore any facts that bear on that authority and that relationship to assess whether the third party had actual authority to consent. See Kieffer, 217 Wis. 2d at 542 ("[I]t is the sufficiency of the consenting individual's relationship to the premises to be searched . . . that the State must establish."). In McGovern we did just that, affirming the suppression of evidence seized on grounds of third-party consent because there was nothing in the record to reflect mutual *741 use of the property, joint access or control, "or that the room's occupants assumed the risk one of their number might permit the common area to be searched." 77 Wis. 2d at 215.
¶ 20. To date, we have had little opportunity to elaborate on the specific factors that weigh on whether an individual has the constitutional authority to invite law enforcement into the home of another. This case requires us to expand the list. First, the relationship of the consenter to the defendant is important, not only in the familial sense, Kieffer, 217 Wis. 2d at 544, but also in terms of the social ties between the two. A romantic[12] *742 relationship, for example, gives rise to different expectations than does a passing acquaintance or a purely economic connection. See, e.g., Chapman v. United States, 365 U.S. 610, 616-17 (1961) (holding that a landlord could not consent to a search of a tenant's home). Second, the duration of the consenter's stay in the premises can shed light on her authority to allow visitors in, though, as we have demonstrated, that alone does not settle the question.[13] See, e.g., Commonwealth *743 v. Lopez, 937 N.E.2d 949, 957 n.9 (Mass. 2010) (including the duration of the guest's stay as a factor in the determination of actual authority to consent). Third, a defendant's decision to leave an individual in his home alone helps support an inference that the individual has been given some choice in excluding some visitors and opening the door to others. See, e.g., United States v. Sanchez, 608 F.3d 685, 689 (10th Cir. 2010) (noting that the consenter was regularly left alone in the home as one of the reasons supporting a finding of actual authority). Of course, the longer a person is left alone in the home, the more likely she will have authority to consent. See, e.g., Davis v. State, 422 S.E.2d 546, 549 (Ga. 1992) (mentioning the limited time period for which the consenter was left alone in the home in finding a lack of authority to consent). Finally, there are the various other miscellaneous facts that may illuminate the depth of an individual's relationship to the premises, such as whether she has been given a key, whether she keeps belongings in the home, whether her driver's license lists the residence as her address, and so on. See State v. St. Martin, 2011 WI 44, ¶ 18 n.10, 334 Wis. 2d 290, 800 N.W.2d 858, cert. denied, 565 U.S. __, 132 S. Ct. 1003 (2012).[14]
¶ 21. We now apply these factors to the facts at hand.
*744 C. PODELLA HAD ACTUAL AUTHORITY TO CONSENT TO OFFICER DORN'S ENTRY INTO THE HOME AND THE LIVING ROOM
¶ 22. An application of the factors enumerated above to the facts of the instant case can lead to but one conclusion: Podella had actual authority to invite Officer Dorn into Sobczak's parents' home. Notably, Podella was Sobczak's girlfriend of three months. It is safe to presume that such an intimate relationship imbues a person with more authority than she would otherwise have vis-a-vis her partner and his home. See, e.g., United States v. Collins, 515 F. Supp. 2d 891, 902 (N.D. Ind. 2007) (remarking that "a close personal... relationship" between the consenter and the defendant bolsters a showing of authority to consent) (footnote omitted). Equally significantly, Sobczak encouraged Podella to spend an evening alone in the home, and placed no apparent restrictions on her use of the house. To extend such trust to Podella, Sobczak must have envisioned her "mutual use of the property" and her possession of "joint access or control for most purposes," Matlock, 415 U.S. at 171 n.7, thus favoring a conclusion that he assumed the risk she would let in unwanted visitors.[15]
*745 ¶ 23. We respectfully disagree with the dissent's claim that Podella did not have joint access or control because "[a]ny access and control. . . was limited to the temporary access and control a weekend guest might have when invited to someone else's home to stay for a short time." Dissent, ¶ 69. The dissent does not clarify what these limitations must be, and we find it difficult to imagine they are so substantial as to eclipse the control she did exercise. Granted, a weekend guest left in a home alone cannot legally sell the property, but it seems she can do a great deal else with it. The fact that Sobczak permitted Podella to stay in the house alone where there are no indicia that he placed any restrictions on her use of the property is a powerful sign that she had the authority to bring Officer Dorn into an area of the home to which visitors would be expected to come.[16]
¶ 24. Lastly, although Podella's weekend invitation does not put her in the company of long-term guests with more expansive authority over the premises, it does distinguish her from the far briefer stays that have occasioned judicial rejection of claims of *746 authority. See, e.g., United States v. Cos, 498 F.3d 1115, 1128 (10th Cir. 2007) (excluding evidence where the consenter was left alone in home for 40 minutes before the arrival of law enforcement).
¶ 25. There are, to be sure, considerations cutting in the opposite direction. In particular, Podella's stay, while not of the extremely brief duration of the consenter's in Cos, was also not of the more indefinite length at issue in many third-party consent cases. See, e.g., Matlock, 415 U.S. at 166 (noting that the consenter lived at the house with her son). Furthermore, there is no evidence that Podella had ever stayed in the house before, that she had been given a key to the residence, that she was leaving any belongings there or intended to return in the future, or any other indication of a relationship to the building that extended beyond the weekend of September 4, 2009. These omissions are not insignificant, and they make the case a far closer one that it would otherwise be. Nevertheless, they are insufficient to outweigh the more compelling factors militating in favor of authority to consent. Ultimately, we believe society would expect a girlfriend of three months, left alone in a home and given unrestricted access to the common areas of the home, to enjoy the authority to invite guests in to those common areas, even with potentially deleterious consequences to her boyfriend.[17]
*747 ¶ 26. The dissent purports to go through the same balancing test that we conduct, but it puts its thumb on the scales and preordains the result by concluding that Podella could not have had actual authority because "[a]ny access or control1' she had "was clearly inferior to that of the defendant.. . ." Dissent, ¶ 69. If the only question for authority purposes was whether the consenter enjoys the same amount of access to and control over the property as the defendant, there would be no need to run through all of the various factors in the list. Instead, a court could simply search the list for the single respect in which the consenter's access or control was "inferior" and then suppress the challenged evidence. That is plainly not the law. See, e.g., United States v. Kimoana, 383 F.3d 1215, 1222 (10th Cir. 2004) (finding that the consenter had actual authority to allow law enforcement to search a motel room because "he had stayed there overnight, left his possessions there, and carried a key to the room" even though he "was not the registered guest who had paid for the room .. .."); United States v. Kim, 105 F.3d 1579, 1582 (9th Cir. 1997) (finding that the consenter had actual authority to permit police to search a storage unit because it was leased in his name, even though the defendant "had the only key to the lock and had general control over the unit" and even though the consenter "did not have independent access and, without [the defendant's] permission,.. . did not have the authority to open the unit (and never did open it for his own purposes).").
¶ 27. There can be no doubt that "the Fourth Amendment has drawn a firm line at the entrance to *748 the house," Payton, 445 U.S. at 590, and it is our duty to zealously guard that line. See Kyllo, 533 U.S. at 37 ("In the home, our cases show, all details are intimate details, because the entire area is held safe from prying government eyes.") (Emphasis in original.) But the line was crossed here upon valid consent, and Officer Dorn's entry was therefore within the bounds set by the Constitution.
¶ 28. Consent to enter a home, however, does not necessarily confer authority to enter a particular room within the home. Cf. Florida v. Jimeno, 500 U.S. 248, 251-52 (1991) (discussing when consent to search a car implies consent to search containers within the car, and when it does not). The Fourth Amendment therefore demands a justification for Officer Dorn's entry to the living room, where the search of the laptop occurred. That justification is readily apparent. Officer Dorn testified, without dispute, that the search took place in the living room, 20 feet inside the front door. Sobczak does not suggest that he had placed the living room off limits to Podella during her visit and, given that she was his girlfriend and was left alone in the home for an evening, it is implausible to imagine that he would have. As a result, Podella had "joint access or control" of the living room "for most purposes," Matlock, 415 U.S. at 171 n. 7, and she was legally entitled to bring Officer Dorn into that room. Cf. Logan v. State, 729 N.E.2d 125, 130-31 (Ind. 2000) (finding proper third-party consent to search a living room where there was "nothing in the record to indicate that police should have been on notice that the room was anything other than what it appeared to be- a living room used by all the residents of the home.").
*749 D. OFFICER DORN'S SEARCH OF THE LAPTOP WAS PERFORMED UPON VALID CONSENT
¶ 29. Having resolved that Officer Dorn's entry to the home and living room were constitutionally permissible, the only question that remains is whether his search of the laptop was as well.[18] For similar reasons, the search did not transgress the Fourth Amendment and the exclusionary rule is therefore inapplicable.
¶ 30. Liberally construing Sobczak's argument on this point, we understand him to maintain that even if Podella had the authority to consent to the entry, she had no authority to consent to the far more intrusive search of the laptop. To substantiate that claim, Sobczak surveys a variety of cases in which a third party let an officer of the law into a home without inviting a search of the premises. Sobczak's conclusion that this collection of cases implies that short-term houseguests can never consent to searches is erroneous because his premise is flawed. That other courts have sanctioned entries without searches does not mean that any search following any such entry is unconstitutional. Indeed, the language of Matlock compels the contrary conclusion: "when the prosecution seeks to justify a warrant- *750 less search by proof of voluntary consent, it... may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." 415 U.S. at 171 (emphasis added) (footnote omitted). If, in a third-party consent case, the State must demonstrate that its inspection of the effects was constitutional in addition to its inspection of the premises, as Matlock teaches, it stands to reason that the State must demonstrate that it had consent to examine those effects. Here that means that after Podella consented to Officer Dorn's entry, an independent analysis must be performed to determine whether she consented to a search of the laptop. Cf. United States v. Karo, 468 U.S. 705, 726 (1984) (O'Connor, J., concurring) ("[W]hen a guest in a private home has a private container to which the homeowner has no right of access... the homeowner ... lacks the power to give effective consent to the search of the closed container."); United States v. Fultz, 146 F.3d 1102, 1106 (9th Cir. 1998) (adopting quoted language from Justice O'Connor's concurrence in Karo); Commonwealth v. Porter P., 923 N.E.2d 36, 48 n.ll (Mass. 2010) ("Even if a coinhabitant of the home had actual authority to consent to a search of the home, the consent would not extend to a closed suitcase, overnight bag, or gym bag located inside the home that did not belong to the coinhabitant.") (citation omitted); United States v. Smairat, 503 F. Supp. 2d 973, 991 (N.D. Ill. 2007) (applying the principles above to computers).
¶ 31. To validate the search of an object within a home on consent, the government must satisfy the same requirements as apply to consent to enter, namely, that the consenter had 'joint access or control" of the object "for most purposes." See, e.g., United States v. Waller, 426 *751 F.3d 838, 845 (6th Cir. 2005). The question of whether Podella had sufficient access or control of the laptop for most purposes such that she was constitutionally entitled to allow Officer Dorn to search it is a far easier one than the question regarding his entry into the home. Undisputedly, Podella was explicitly granted permission by Sobczak to use the laptop, and the record contains no intimations of Sobczak placing any parameters on that use. Moreover, Podella used the computer in a common area of the house — the living room — which is where Officer Dorn conducted the search. It is also relevant that Officer Dorn opened only those files to which Podella had called his attention; a more searching examination of the machine occurred only after a search warrant was obtained. No one involved in the case has ever averred that the files inspected upon Podella's consent were password protected, and it is consequently safe to assume that they were accessible to anyone using the laptop. We therefore have no difficulty in saying that Podella was authorized to consent to Officer Dorn's search of the laptop. See State v. Ramage, 2010 WI App 77, ¶¶ 7-18, 325 Wis. 2d 483, 784 N.W.2d 746 (upholding the search and seizure of a computer on consent offered by an individual who was allowed by the defendant to use the machine without password protection); see also United States v. Stabile, 633 F.3d 219, 233 (3d Cir.) (concluding that an individual had authority to consent to a search and seizure of the defendant's hard drives where the computer was used by both the consenter and the defendant, was not password protected, and was located in a common area), cert. denied, 565 U.S. __, 132 S. Ct. 399 (2011). In short, the Fourth Amendment permitted Officer Dorn to search the files Podella had viewed on her consent.
*752 ¶ 32. It is important to underscore the limitations of today's decision. As the court of appeals cautioned, "We are not holding that the girlfriend's status as a houseguest gave her carte blanche to consent to a search of all the contents in the home. Rather, her authority to consent to a search was limited to the property that she possessed 'common authority' over." Sobczak, 338 Wis. 2d 410, ¶ 13. We agree. Officer Dorn went only into the living room, a common area of the residence, and searched only the laptop, an object Podella had been granted explicit permission to use. For present purposes, it is enough to say that Officer Dorn's entry and search complied with the dictate of the Fourth Amendment. Future courts should consider future cases with this sensitivity to detail in mind.
¶ 33. Because Podella had actual authority to consent, we need not — and do not — consider the other issues raised by the parties: apparent authority, the independent source doctrine, and the inevitable discovery doctrine. See State v. Cain, 2012 WI 68, ¶ 37 n.ll, 342 Wis. 2d 1, 816 N.W.2d 177 ("In conformity with our prior practice, we choose to decide this case on the narrowest grounds possible . . . .") (citations omitted).
V. CONCLUSION
¶ 34. Our Constitution obeys the "centuries-old principle of respect for the privacy of the home," Wilson, 526 U.S. at 610, and the state therefore may not intrude into a residence without a warrant unless it satisfies one of the few and narrowly-drawn exceptions to the warrant requirement. Welsh, 466 U.S. at 749. One exception permits the police to enter the home when the prosecution can persuade a court that the officer *753 was invited to cross the threshold by someone authorized by the defendant to extend such invitations. Matlock, 415 U.S. at 171. At issue now is whether Podella had such authority when she invited law enforcement to enter Sobczak's residence and -view suspicious files on his computer. The circuit court found that she did have that authority and accordingly denied Sobczak's motion to suppress, and the court of appeals agreed. We agree with both the trial and appellate courts, and consequently affirm the decision of the court of appeals.
By the Court. — The decision of the court of appeals is affirmed.
¶ 35. David T. Prosser, J., did not participate.
¶ 36. (concurring). I join the majority's opinion, and I agree with the majority's conclusion that the police actions in this case were not unconstitutional. I write separately to emphasize our consideration of Podella's authority to consent to the search of this portable laptop under the facts presented.

 More specifically, Officer Nathanial (spelled "Nathaniel" elsewhere in the record) Dorn testified at the suppression hearing that Podella informed him that she and Sobczak met approximately three months earlier and "had been dating." In Sobczak's statement of facts in his initial brief, Podella describes Sobczak to Officer Dorn as "her boyfriend of three months." No party disputes either Officer Dorn's characterization in his testimony or Sobczak's in his filing — indeed, the State adopts Sobczak's statement of the facts as its own and presents only certain additional facts. For convenience, we will use "romantic," "dating," "girlfriend," and similar terms in our opinion in discussing the type of relationship between Podella and Sobczak. We do not thereby imply that we are drawing a firm line in Fourth Amendment law based on the degree of intimacy shared by the consenter and the defendant, though that degree is one factor to be considered amongst several, and it is one factor we consider here. See ¶ 20 infra.

 The motion to suppress also made reference to the Fifth Amendment, but Sobczak does not raise a Fifth Amendment argument here.

 In its oral ruling, the circuit court appeared to rely upon a variety of other justifications for upholding the search, including exigent circumstances, property law, and public policy, among others. The State does not defend the judgment on any of these grounds and we do not consider them.

 A parallel provision is enshrined in the Wisconsin Constitution. Wis. Const. Art. I, § 11. Sobczak relies solely upon its federal counterpart, so our discussion too will be limited to the U.S. Constitution. In any event, though, we ordinarily interpret the two identically. See State v. Kramer, 2009 WI 14, ¶ 18, 315 Wis. 2d 414, 759 N.W.2d 598 ("On only one occasion in our development of Article I, Section 11 jurisprudence have we required a showing different from that required by the [U.S.] Supreme Court's Fourth Amendment jurisprudence.").

 According to his testimony, Officer Dorn discussed with Podella the possibility of her bringing the laptop outside the home for him to inspect it. She never did so, however, so we need not analyze the constitutionality of that hypothetical scenario.

 In a recent decision on a Fourth Amendment question relating to law enforcement's use of global positioning systems, the U.S. Supreme Court explained that property law remains *736 relevant to search-and-seizure jurisprudence in certain circumstances. See United States v. Jones, 565 U.S. __, 132 S. Ct. 945, 950 (2012) (clarifying that while some of the court's cases "deviated from [an] exclusively property-based approach," it never renounced the notion that the Fourth Amendment embodies "a particular concern for government trespass upon the areas" protected by the Amendment). The Jones court, however, did not suggest that third-party consent cases must now be viewed through the lens of formal property law, after United States v. Matlock, 415 U.S. 164 (1974) said the opposite, and other courts have not read Jones as working such a dramatic change in the law. See Braskett v. Fender, 884 F. Supp. 2d 1119, 1130 (D. Or. 2012) (quoting Matlock's repudiation of property law in the third-party consent context and not mentioning Jones)\ People v. Fernandez, 145 Cal. Rptr. 3d 51, 59 (Ct. App. 2012) (same), cert. granted, 569 U.S. __, __ S. Ct. __, 2013 WL 2149804 (2013); Pryor v. City of Clearlake, 877 F. Supp. 2d 929, 944 (N.D. Cal. 2012) (same). We follow Matlock's dictate on third-party consent and its separation from property law, as neither the U.S. Supreme Court nor our own has departed from its analytical approach.

 Instructively, the approach we take today was followed by a court that reached the opposite outcome, but did so not with reference to the inflexible rule advocated by Sobczak, but rather in consideration of the quality of the relationship between the consenter and the premises. In that decision, Cardenas v. State, the Texas Court of Appeals declared, "At best, [the consenter] was merely a" passing acquaintance who happened to spend the night. "Consequently," the court reasoned, "he did not have actual authority to consent to the officer's entry." 115 S.W3d 54, 60 (2003) (citation omitted). The distinction between a passing acquaintance who happens to spend the night like the consenter in Cardenas and an overnight guest in a romantic relationship with the defendant is precisely the type of distinction that alters *738 the "widely shared social expectations" regarding access and risk that guide our inquiry. Georgia v. Randolph, 547 U.S. 103, 111 (2006).

 The full passage reads, in its entirety: "On these facts the State has not established that, with respect to the South California apartment, Fischer had 'joint access or control for most purposes.' To the contrary, the Appellate Court's determination of no common authority over the apartment was obviously correct." Illinois v. Rodriguez, 497 U.S. 177, 181-82 (1990).

 Though it was unclear whether she obtained the key with the defendant's permission. Rodriguez, 497 U.S. at 181. Officer Dorn testified that he had no recollection whether he asked Podella if she had a key to the residence, and we consequently cannot base our decision on a finding that she did.

 The dissent's characterization of our comments on Rodriguez borders on the disingenuous. It accuses us of "reject[ing] the Supreme Court's holding as 'cursory'" when it was instead "measured and deliberate ...." Dissent, ¶ 74 (emphasis added). Though the dissent prefers to pretend otherwise, Rodriguez contains three holdings: 1) the consenter had no actual authority; 2) the state court relied upon federal and not state law; and 3) a remand was necessary for a determination of whether there was apparent authority. See generally Rodriguez, 497 U.S. 177. The section deemed "measured and deliberate" by the dissent takes up one paragraph, contains a single citation (to Matlock), and includes no substantive analysis. Id. at 181-82. In stark contrast, Justice Scalia devoted 10 paragraphs, 6 pages, and citations to 13 different cases to resolve the third issue. One need not be a constitutional scholar to readily detect the court's principal motive for taking up and deciding the case: it was to establish, for the first time, the new doctrine of apparent authority (which required the court to find no actual authority), not to recite a bare-bones summary of a doctrine that was already 16-years old at the time and then apply it without any substantive analysis. That is not to say that we can ignore Rodriguez's words concerning actual authority, and we do not do so. Unlike the dissent, however, we opt not to bury our heads in the sand regarding the context of Rodriguez and Matlock in attempting to resolve the tension between the two.

 The dissent describes our opinion as "refusing] to recognize" Rodriguez as binding. Dissent, ¶ 74. Untrue. We acknowl *740 edge, as we must, that Rodriguez is binding, but so too is Matlock, and the result of the former is incompatible with the test set forth by the latter. It is not a novel situation for tension to exist between two binding precedents. When it does, we discharge our constitutional duty as a law-developing court better by honestly grappling with the tension, as we have done here, rather than ignoring it, as the dissent elects to do.

 We are perplexed by the dissent's concern over our occasional use of the words "romantic" and "intimate." See dissent, ¶¶ 62-64. While the dissent is troubled that the terms "girlfriend" and "dating" are undefined, it provides no definition for the apparently crucial word "romantic." As we have noted, we use "romantic" merely to indicate that Sobczak and Podella enjoyed a more intimate association than, say, strangers or passing acquaintances. See supra ¶ 2 n.l. The dissent appears to assume that the term "romantic" applies only to star-crossed lovers of the Romeo and Juliet variety. While we admire the dissent's idealism, we use the word in the more pedestrian sense to convey an intimate, personal relationship. Prior to today's protestations from the dissent, we would not have thought such a use controversial. See, e.g., Lasure v. Commonwealth, 390 S.W.3d 139, 140 (Ky. 2012)("Thereafter, Lasure's relationship with Tolliver became romantic and the two began casually dating."); Tex. Fam. Code Ann. § 71.0021(b) (West 2013) (defining "dating relationship" as "a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature"). We might just as accurately have used the term "dating relationship" instead of "romantic relationship," but because there is no need to do so, we are comfortable with our chosen nomenclature. At any rate, we agree with the dissent's more general observation that "[t]he more distant the relationship [between the consenter and the resident], the more *742 likely" there is no actual authority. Dissent, ¶ 61. When all is said and done, the dissent's quibble regarding our terminology serves more as a smokescreen for its dubious application of this general principle than as the articulation of a meaningful dispute. For the only real upshot of the dissent's lengthy exegesis on the nature of romance is that it considers a girlfriend of three months to be a distant association under the Fourth Amendment. Neither society nor the Constitution shares that groundless assumption.

 In rather overheated prose, the dissent remarks that "federal and state courts alike have held the line, refusing to recognize that temporary guests, without more, have actual authority to consent." Dissent, ¶ 79. Drama aside, the insertion of the caveat "without more" strips this sentence of any discernible content. Certainly the Fourth Amendment does not permit the police to rifle through a person's drawers at the behest of a complete stranger invited into a foyer for five minutes. If that is what the dissent means to say, its statement is quite right, and quite beside the point, as Podella does not remotely fit that description. If instead the dissent means to imply that a nonresident can never offer consent, that is simply not the law. The leading treatise on Fourth Amendment jurisprudence notes the "sound authority" that allows a guest who has "the run of the house" to consent "to a police entry into an area where a visitor would normally be received." 4 Wayne R. LaFave, Search and Seizure, § 8.5(e) (5th ed. 2012). LaFave is routinely cited in search and seizure cases, including in numerous decisions by this court and the U.S. Supreme Court. See, e.g., State v. Sveum, 2010 WI 92, ¶ 33, 328 Wis. 2d 369, 787 N.W.2d 317; Arizona v. Gant, 556 U.S. 332, 345 n.5 (2009). More to the point, the rule enunciated in § 8.5(e) is cited to seven opinions and has, in turn, *743 been cited in jurisdictions around the country. See, e.g., State v. Morse, 123 P.3d 832, 837-38 (Wash. 2005); Hilbish v. State, 891 P.2d 841, 848 (Alaska Ct. App. 1995). The dissent's assertions notwithstanding, we break no new legal ground here.

 We hasten to add that the list above is not exclusive but rather composed with an eye to the facts of the case at bar. Other searches will no doubt implicate other factors that may assist in the inquiry. For a more extensive list of potential factors, see, e.g., United States v. Groves, 530 F.3d 506, 509-10 (7th Cir. 2008).

 The dissent maintains that "nothing in the record supports" our view that Sobczak assumed the risk that Podella would invite unwanted guests onto the premises. Dissent, ¶ 58. However, the fact that the record contains no indication of any restrictions placed upon Podella's use of the house is itself evidence that she was granted unlimited use of it, which in turn reinforces the conclusion that Sobczak assumed the risk of her welcoming the police into the home. Cfi United States v. Sanchez, 608 F.3d 685, 689 (10th Cir. 2010) (finding actual authority in part because "nothing in the record suggests any restrictions or limitations whatsoever on [the consenter's] access to or use of any part of the home.").

 That does not necessarily mean that Podella would have been entitled to invite Officer Dorn into every area of the house. If Officer Dorn had conducted the search in a different room, other facts, such as whether the room was locked, would presumably have been brought out at the suppression hearing and those facts would then bear on the Fourth Amendment analysis. Cf. State v. Yinuya, 32 P.3d 116, 128-32 (Haw. Ct. App. 2001) (finding actual authority to consent to a search of the common areas of the house but no actual authority to consent to a search of the defendant's locked bedroom). That is not the case before us. We consider Podella's seemingly unrestricted use of the home only as it relates to her invitation to Officer Dorn to enter the living room and search the laptop there. We make no comment regarding any other area of the residence.

 The dissent chides us for making it "easier for a weekend houseguest than a co-resident to be accorded authority to consent to a search of another's residence." Dissent, ¶ 72. We have done no such thing. As should be abundantly clear from a cursory review of our opinion, many of the factors we consider would quite obviously lend themselves to a stronger case for authority with a resident than with a weekend guest. For instance, the duration of a consenting resident's stay would presumably be indefinite or at least substantial, and such a person would almost certainly be left home alone at times, would possess a key, would *747 have belongings at the premises, and so on. Contrary to the dissent's undefended assumption, the fact that this weekend guest had authority does not mean that all do.

 Sobczak's position regarding the relationship between the entry and the search is less than crystal clear. On the one hand, he repeatedly frames the issue in terms of the search, characterizing it in one place as whether "Podella, as a weekend visitor, [had] the authority to subject. .. Sobczak's home and its contents to a police search." (Emphasis added.) On the other hand, Sobczak concedes in his reply brief that he is no longer "asserting] an independent privacy interest in his computer" or "disputing] . . . Podella's authority to consent to its search." We are unsure as to how these two contentions can be reconciled. Nonetheless, in the interest of clarity and comprehensiveness, we will address the search.