DAVID T. PROSSER, J.
¶ 95. (dissenting). Several of the techniques employed by the law enforcement officer in this case are common in Wisconsin. The officer stopped a vehicle for minor traffic violations. He quickly learned that a passenger in the vehicle was a convicted felon with a history of drug abuse. With consummate skill, the officer embarked on a plan to elicit consent to search the vehicle so that he could determine whether it contained controlled substances. Most of the techniques the officer employed have been approved by this and other courts. The question presented here is whether the officer crossed the line of reasonableness by disregarding an apparent objection to a consent search and thereby violated the Fourth Amendment. I believe he did. Because the majority concludes otherwise, I respectfully dissent.
FACTS SURROUNDING THE SEARCH
¶ 96. On August 26, 2010, a Sheboygan County deputy sheriff stopped a vehicle driven by Dennis Wantland (the driver) on Butler Street in Random *171 Lake. The vehicle had a cracked windshield and a defective brake light. The officer asked the driver for his license. He also asked the passenger, the driver's brother, for his license. The officer then took the licenses and returned to his squad car, with its red and blue lights flashing, to run an identity check on the two men. Before he returned to the vehicle, the officer knew the driver had a minor record but that the passenger, Derik Wantland ("Wantland" or "the defendant"), was a repeat offender who had used drugs.
¶ 97. When he returned to the vehicle with a warning citation, the officer asked the driver to step out of the car and accompany him behind the vehicle to examine the defective "third brake lamp."
¶ 98. The officer later explained to the court that he made it a practice to ask a driver to leave his vehicle to show him "exactly what I'm talking about."
Some people don't know what I mean by "third brake lamp," so I'll take them out of the vehicle, point out the brake lamp. And I've had the experience myself of trying to replace things, so I'll try to explain to them, you know, where you can get a light bulb, or how much, roughly, it would cost to get it fixed, and I kind of explain it to them, and then explain the written warning to them, tell them about the windshield, the safety of it, you know, that it's there to prevent anything from coming through the windshield, and if they would hit something that would hit the windshield, with it already being cracked, it's not as safe as it would be, you know, completely basically not broken, and kind of explain to them the reason for it.
¶ 99. The officer described his "conversational tone, trying to explain to [the driver] the reason for the stop and why he should get the things fixed." Then he went on:
*172 At that point, I asked if [the driver] had any questions, which I do on every traffic stop. If they have any questions, I'll be more than happy to answer them. He advised no, and I advised him he was free to leave, at which point I started walking back to my car, and he was walking back to the driver's door.[1]
(Emphasis added.)
¶ 100. The officer walked toward the door of his squad car. Then, in a tactic reminiscent of Lieutenant Columbo, he suddenly turned around and asked the driver if there was anything in the vehicle that wasn't supposed to be there. When the driver answered no, the officer immediately asked him "if he would mind if I did a consent search of the vehicle." "The driver said 'yes, go ahead,'" the officer testified. On this point, the majority quotes the driver as saying: "Um, I don't see why not. We gotta get our tools and stuff out anyway." Majority op., ¶ 7.
¶ 101. In his police report, the officer wrote: "They asked if they could remove their items out of the rear of the vehicle and put them in the house at which point, I asked them to stand alongside the roadway and when I was done searching the car, they could remove their items."[2]
*173 ¶ 102. The officer obtained the driver's consent to search the vehicle, but the above-quoted passage from the police report reveals tension between the driver's consent and the brothers' expressed desire to remove their property from the vehicle.
¶ 103. Given the driver's consent to search, the officer asked Wantland to get out of the car and directed him to join his brother at the curb. For the next six and a half minutes, the officer conducted a very thorough search of the interior of the vehicle using a flashlight and his hands. The officer opened both the driver's door and the passenger's door. He climbed into the vehicle from each side, opened the glove compartment, looked under the seats, checked the shelf near the back window, and ran his fingers through tight, concealed areas next to the seats. Finding nothing but some razor blades, which the driver explained were used in painting, the officer moved to the trunk area.
¶ 104. After searching the passenger compartment, the officer "opened the back hatch of the vehicle and observed a variety of tools and toolboxes, along with a briefcase." Majority op., ¶ 9. With his back to the squad car camera, the officer asked: "What's in the briefcase?"
¶ 105. For the first time, Derik Wantland spoke up: "A laptop. Uh. Got a warrant for that?"[3]
*174 ¶ 106. The officer replied, "I can open up the, uh, laptop," and he proceeded to remove the briefcase from the vehicle and open it up. The sound track of the video records nervous laughter from Wantland who says, in response to the officer, "Yeah, it's uh, laptop, Visine, acid reflux."
¶ 107. According to the record, there were documents in the briefcase with Wantland's name. There was also a pair of scissors, a jackknife, coins, a bottle of Visine, and two opaque plastic pill bottles, at least one of which was for Benicar 40 mg.
¶ 108. The officer opened one of the plastic bottles and found two purple capsule-type pills that turned out to be morphine, a controlled substance. Later, at the Sheboygan County Jail, officers discovered two more pills in Wantland's pocket. These four pills constitute the evidence that the defendant sought to suppress.
DISCUSSION
¶ 109. The majority opinion takes the view that the driver of the car gave the officer consent to search the vehicle. Consent to search the vehicle included consent to search containers in the vehicle. The majority concludes that neither the driver nor the passenger ever effectively withdrew the driver's consent, and that the officer had no duty to ask any follow-up questions when Derik Wantland asked, "Got a warrant for that?" See majority op., ¶ 5
¶ 110. We are concerned here with application of the Fourth Amendment, which provides:
*175 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const. amend. IV
¶ 111. Article I, Section 11 of the Wisconsin Constitution is nearly identical, and historically, it has been interpreted to be consistent with United States Supreme Court interpretation of the Fourth Amendment. See State v. Dearborn, 2010 WI 84, ¶ 14, 327 Wis. 2d 252, 786 N.W.2d 97.
¶ 112. In Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971), the Supreme Court summarized the law on warrantless searches:
[T]he most basic constitutional rule ... is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." The exceptions are "jealously and carefully drawn," and there must be "a showing by those who seek exemption ... that the exigencies of the situation made that course imperative." "[T]he burden is on those seeking the exemption to show the need for it."
Id. (second ellipsis and second brackets in original) (footnotes omitted). These passages have been repeatedly quoted or paraphrased in Wisconsin decisions.[4]
*176 ¶ 113. One well-established exception to the warrant requirement is consent. State v. Phillips, 218 Wis. 2d 180, 196, 577 N.W.2d 794 (1998); State v. Artic, 2010 WI 83, ¶ 29, 327 Wis. 2d 392, 786 N.W.2d 430; IState v. Williams, 2002 WI 94, ¶ 18, 255 Wis. 2d 1, 646 N.W.2d 834; State v. Matejka, 2001 WI 5, ¶ 17, 241 Wis. 2d 52, 621 N.W.2d 891. Voluntary third-party consent is an established form of consent. Matejka, 241 Wis. 2d 52, ¶ 17.
¶ 114. The fact that "consent" is an established exception and that third-party consent can be acceptable does not mean that the consent exception does not present issues such as authority to give consent, scope of the consent, and the voluntariness of the consent.
¶ 115. There is no dispute here that the driver voluntarily consented to the officer's search of the vehicle. He was surely authorized to consent to the search of anything in the vehicle that he owned or lawfully controlled or shared with his brother. The question is whether his consent to search the vehicle not only covered a closed container within the vehicle, but also remained valid after his non-ownership of the closed container became clear by virtue of the fact that Wantland answered the officer's question with intimate knowledge of the contents of the briefcase and Want-land appeared to object to the search.
¶ 116. In Florida v. Jimeno, 500 U.S. 248, 249 (1991), the Supreme Court was asked to decide *177 "whether a criminal suspect's Fourth Amendment right to he free from unreasonable searches is violated when, after he gives a police officer permission to search his automobile, the officer opens a closed container found within the car that might reasonably hold the object of the search." The Court concluded that the Fourth Amendment was not violated: "The Fourth Amendment is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to open a particular container within the automobile." Id.
¶ 117. The facts in Jimeno are materially different from the facts in this case. First, in Jimeno, the defendant was the person who gave consent to search the vehicle. Id. at 249-50. Second, the arresting police officer told the defendant before he gave consent that the officer "had reason to believe that Jimeno was carrying narcotics in his car." Id. at 249. Third, the officer "explained that Jimeno did not have to consent to a search of the car." Id. Fourth, the officer saw and then opened a brown paper bag on the floor of the car and found a kilogram of cocaine inside. Id. at 250. Fifth, the defendant never said anything that limited or withdrew his consent.
¶ 118. Here, the defendant's brother, whose guard was down and who presumably had nothing in the vehicle to be concerned about, was the person who gave consent — not the defendant. The officer gave the defendant no warning about his search objective and no counsel that the defendant could refuse consent to a search of his property. The officer's search went into an opaque closed bottle in a closed briefcase in a closed trunk, and the defendant, after demonstrating ownership of the briefcase, asked the officer: "Got a warrant for that?"
*178 ¶ 119. Was it objectively reasonable for the officer to believe that the driver had given him consent to open up a pill bottle in his brother's briefcase? If so, was it still objectively reasonable for the officer to continue the search of the briefcase after Wantland asked his question?
¶ 120. The defendant's question may not have been perfect but it should have alerted the officer that the defendant was challenging a "consent" search of his briefcase. It would be difficult to articulate what other objective the defendant might have had when he asked about a warrant. The defendant had just witnessed the officer dig through the car like a police dog on assignment. He knew that his briefcase was the next target. "Got a warrant for that?" he asked.
¶ 121. The officer did not ask a follow-up question. Instead, his answer was an assertion of authority that shut down discussion. It effectively precluded dialogue. "I can open up the, uh, laptop" is not a responsive answer to the question.
¶ 122. The officer's "conversational tone" was now gone. His professed willingness to answer "any questions" had ended. His helpful hints on where to buy brake lights evolved into a series of orders. The officer was on a mission. If there were any doubt about the officer's new persona, it was put to rest when Derik Wantland walked to his house to go to the bathroom. The officer quickly pursued him, following him to the bathroom, ordering him not to flush the toilet, and threatening that if he did, the officer "could shut the water off and take the toilet off and go into the trap and find anything that had been stuck in the trap."
¶ 123. This is a consent case. The officer had no probable cause or reasonable suspicion to conduct a search. The continuing validity of the consent to search *179 must be assessed in light of the totality of the circumstances, which moved from the broad consent given by one brother to the pointed question posed by the other brother as the officer began to handle the property of the other brother.
¶ 124. I acknowledge that conscientious judges may assess these circumstances differently. In my view, the defendant withdrew any "consent" to search his briefcase, and the officer simply disregarded him. Because the majority's assessment is different from mine, I respectfully dissent.
¶ 125. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice ANN WALSH BRADLEY join this dissent.

 The officer advised the driver that he was free to leave. It is not clear whether the driver had someplace else to go. Wantland was on Butler Street in front of his house.

 The following exchange took place at the suppression hearing:
DEFENSE ATTORNEY: And at one point, Derik Wantland actually asked if he could obtain his items out of the vehicle.
OFFICER: Yes, they'd asked if they could get their tools out of the vehicle. This was after the search had begun on the vehicle. And again I told them no.

 The transcript of the suppression hearing reads in part as follows:
DEFENSE ATTORNEY: And as you were searching the back portion of the vehicle, you asked a question of, I guess, Derik Wantland and Dennis Wantland about what was in the briefcase; is that correct?
OFFICER: I may have asked what was inside the briefcase, yes.
*174 DEFENSE ATTORNEY: And at that point, Derik Wantland asked you if you had a search warrant.
OFFICER: Yes, he did.

 State v. Sobczak, 2013 WI 52, ¶ 11, 347 Wis. 2d 724, 833 N.W.2d 59, cert. denied, 134 S. Ct. 626 (2013); State v. Artic, 2010 WI 83, ¶ 29, 327 Wis. 2d 392, 786 N.W.2d 430; State v. *176 Pinkard, 2010 WI 81, ¶ 13, 327 Wis. 2d 346, 785 N.W.2d 592; State v. Faust, 2004 WI 99, ¶ 11, 274 Wis. 2d 183, 682 N.W.2d 371; State v. Williams, 2002 WI 94, ¶ 18, 255 Wis. 2d 1, 646 N.W.2d 834; State v. Matejka, 2001 WI 5, ¶ 17, 241 Wis. 2d 52, 621 N.W.2d 891; State v. Pallone, 2000 WI 77, ¶ 29, 236 Wis. 2d 162, 613 N.W.2d 568; State v. Phillips, 218 Wis. 2d 180, 196, 577 N.W.2d 794 (1998).