*202 SHIRLEY S. ABRAHAMSON, C.J.
¶ 52. (<dissenting). "Advances in technology offer great benefits to society in many areas. At the same time, they can pose significant risks to individual privacy rights."[1] The proliferation of cell phones and their location tracking capabilities exemplify the risks to privacy rights posed by technological advancement.
¶ 53. The criminal cases State v. Tate[2] and State v. Subdiaz-Osorio[3] raise the question whether individuals have a constitutional right of privacy in their cell phone location data. In other words, do the United States[4] and Wisconsin Constitutions[5] permit law enforcement to access a person's cell phone location data without a warrant?
¶ 54. Cell phones are a "pervasive and insistent part of daily life . . . ."[6] The vast majority of Americans own cell phones; the Pew Research Center has reported *203 that, as of May 2013, 91% of American adults have a cell phone and 56% have a smartphone.[7] Cell phones are literally and figuratively attached to their users' persons, such that "the proverbial visitor from Mars might conclude they were an important feature of human anatomy."[8] Unlike land-line phones, people generally carry cell phones with them at all times — at home, in the car, at work, and at play.
¶ 55. Cell phones can thus serve as powerful tracking devices that can pinpoint our movements with remarkable accuracy. They can isolate in time and place our presence at shops, doctors' offices, religious services, Alcoholics Anonymous meetings, AIDS treatment centers, abortion clinics, political events, theaters, bookstores, and restaurants, and identify with whom the user of the cell phone associates.[9] Cellular service providers have records of the geographic location of almost every American at almost every moment of the day and night.[10] Accessing this information reveals intimate details about a person and intrudes on the constitutional right of association. The United States Supreme Court characterizes location data as "qualitatively different" from physical records, noting that *204 location data can "reconstruct someone's specific movements down to the minute, not only around town but also within a particular building."[11] The more precise the tracking, the greater the privacy concerns.
¶ 56. Cell phone location data can also be a formidable instrument in fighting crime. In both Tate and Subdiaz-Osorio, the law enforcement officers were performing their important public safety duties by investigating violent crimes. Both criminal suspects were apprehended in relatively short order through law enforcement use of cell phone location data.
¶ 57. The officers in Tate and Subdiaz-Osorio had to deal with the thorny issues raised by seeking access to individuals' cell phone location data. Law enforcement is the first word in interpreting constitutional requirements; the courts are the last.
¶ 58. It is this court's responsibility to evaluate a potential search "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Wyoming v. Houghton, 526 U.S. 295, 300 (1999).
¶ 59. This court owes it to law enforcement, lawyers, litigants, circuit courts, the court of appeals, and the public at large to provide clarity about when a search has occurred regarding cell phone location data and what procedures must be undertaken by the government to render such searches constitutional.[12] A clear set of rules will protect privacy interests and also give guidance to individuals evaluating these interests.
*205 ¶ 60. Rather than dance around the issue of whether government access to cell phone location data in the instant cases is a search within the meaning of the Constitutions, I propose that the court address it head-on. Government access to cell phone location data raises novel legal questions of great importance for the privacy rights of the public in an emerging area of technology— exactly the type of questions appropriate for resolution pursuant to this court's law-developing function.
¶ 61. I conclude that government access to cell phone location data in the instant cases, which involves invasive surveillance of an individual's movements, is a search within the meaning of the Constitutions.[13] To read the Constitutions more narrowly is to ignore the vital role that the cell phone has come to play in private communications, to paraphrase the United States Supreme Court in Katz v. United States, 389 U.S. 347, 352 (1967).[14]
¶ 62. People do not buy cell phones to have them serve as government tracking devices. They do not expect the government to track them by using location information the government gets from cell phones.[15] People have a subjective expectation of privacy in cell phone location data that society is prepared to recog *206 nize as reasonable. Thus, absent a warrant, such a search is per se unreasonable.[16]
¶ 63. If the State does not have a warrant, the State can access cell phone location data only if the State can demonstrate one of the narrowly drawn exceptions to the warrant requirement. In both Tate and Subdiaz-Osorio, law enforcement officers could have accessed cell phone location data with a properly authorized warrant that complied with existing relevant statutes.[17] They did not.
¶ 64. I address the balance between privacy interests and law enforcement interests as presented by Tate and Subdiaz-Osorio.[18] These two cases address substantially similar issues regarding government access to cell phone location data but pose distinct fact patterns.
¶ 65. Neither the Tate majority opinion nor Justice Prosser's lead opinion in Subdiaz-Osorio decides whether the government access in question constituted a search within the meaning of the United States and Wisconsin Constitutions. Both opinions assume that a search occurred.
¶ 66. Despite the insistence of the Tate majority opinion and Justice Prosser's lead opinion in Subdiaz-Osorio that they merely assume, without deciding, that the government access was a search in each case,[19] both opinions address the search issue as they elaborate on *207 cases and principles underlying their assumption that a search occurred.
¶ 67. The Tate majority opinion and Justice Prosser's lead opinion in Subdiaz-Osorio refer to and draw guidance from the same Wisconsin and United States Supreme Court cases, including the recently mandated Riley v. California, 573 U.S. _, 134 S. Ct. 2473 (2014).[20]
¶ 68. The Tate majority opinion and Justice Prosser's lead opinion announce principles of law that overlap and to an extent conflict with each other.[21] The two opinions, as well as the separate writings in Subdiaz-Osorio of Justices Ann Walsh Bradley, N. *208 Patrick Crooks, and Patience Drake Roggensack, must thus be read together carefully to understand the court's position on the constitutionality of law enforcement access to a person's cell phone location data.[22]
¶ 69. To address the overlapping issues raised by these two cases, I organize my dissenting opinions as follows. Each heading number corresponds to the relevant subdivision of each dissent.
¶ 70. In my dissent in Tate, I address the following main points:
Part I. The police access to the defendant's cell phone location data, an issue in both Tate and Subdiaz-Osorio, was a search within the meaning of the Constitutions.[23]
Part II. The search existed as a trespass.[24]
*209 Part III. The search existed as an invasion of an individual's reasonable expectation of privacy.
A. The subjective expectation of privacy was not undermined by:
1. The cell phone contract;[25] or
2. The third-party doctrine.[26]
*210 B. Society recognizes a reasonable expectation of privacy in cell phone location data.[27]
Part TV. Wisconsin Stat. § 968.135, the statute setting forth the requirements for a subpoena of documents, should have been followed — it was not in either Tate or in Subdiaz-Osorio [28]
¶ 71. In my dissent in Subdiaz-Osorio, I address two main points:
*211 Part V. The State failed to meet its burden to demonstrate the existence of exigent circumstances;[29] and
Part VI. The defendant invoked his Miranda right to an attorney at his interrogation.[30]
*212 ¶ 72. My discussion in Parts I-IV of my Tate dissent is relevant to Subdiaz-Osorio, and I incorporate Parts I-IV of my Tate dissent into my Subdiaz-Osorio dissent without repeating them in full.[31]
¶ 73. Accordingly, I dissent in both cases.
I
¶ 74. The majority opinion in Tate and Justice Prosser's lead opinion in Subdiaz-Osorio do not answer the core question presented: Does law enforcement's access to an individual's cell phone location data in the present cases constitute a search under the Wisconsin and United States Constitutions? I would answer this important question in the affirmative.[32]
*213 ¶ 75. The various opinions in Tate and Subdiaz-Osorio disagree about the impact of the recent United States Supreme Court case Riley v. California, 573 U.S. _, 134 S. Ct. 2473 (2014). Riley held that law enforcement must obtain a warrant before searching the contents of a cell phone in a search incident to arrest. The Riley opinion extolled the strong privacy interests of individuals in electronic data stored, accessed, or maintained on cell phones.
¶ 76. The majority opinion in Tate and Justice Prosser's lead opinion in Subdiaz-Osorio distinguish Riley by stating that Riley does not address the instant question: whether a defendant has a reasonable expectation of privacy in location data. They relegate Riley to a footnote.[33] Conversely, Justice Crooks' con *214 currence in Subdiaz-Osorio relies heavily on Riley for its statements on the privacy interests of individuals in cell phone data to determine that police access of cell phone location data constitutes a search.[34]
¶ 77. The issue in the instant case of whether access of cell phone location data constitutes a search was not before the Court in Riley. I do not rely on Riley's holding regarding search incident to arrest in my analysis. The language in Riley is, however, instructive in the instant case. I draw from the teachings of Fourth Amendment case law of both Wisconsin and the United States regarding privacy interests to analyze whether a search occurred within the meanings of the Wisconsin and United States Constitutions in the present case. I analyze and apply the case law using both the trespass and the reasonable expectation of privacy doctrines applicable to the Fourth Amendment.
¶ 78. The case law of our state already provides us with ample basis to determine that the law enforcement access in Tate and Subdiaz-Osorio constituted searches within the meaning of the Constitutions.
¶ 79. In State v. Brereton,[35] the court forcefully declared that law enforcement access and monitoring of an individual's location data through the use of a Global Positioning Systems (GPS) device on a motor vehicle is a search within the meaning of the Constitutions.[36] If *215 the collection of location data via a GPS device attached to a motor vehicle is a search, then government acquisition of more invasive cell phone location data is a search. Cell phone location data is often more sophisticated and precise, and cell phones' ubiquity raises greater privacy concerns than GPS tracking of a motor vehicle.
¶ 80. The Brereton court explained that "warrant-less GPS tracking would constitute a search even in the absence of a trespass, [because] a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable."[37]
¶ 81. If there was any doubt that the Brereton court held that the GPS tracking of location data was a search within the meaning of the Constitutions, the Brereton court added:
The privacy interest at issue.. . , where the government has utilized [the defendant's] property to apply GPS technology to monitor his movements, is government usurpation of an individual's property "for the purpose of conducting surveillance on him, thereby invading privacy interests long afforded, and undoubtedly entitled to, Fourth Amendment protection."[38]
¶ 82. Brereton relied on United States v. Jones, 565 U.S. _, 132 S. Ct. 945 (2012), in which the United States Supreme Court unanimously determined that the attachment of a GPS device to a motor vehicle was a search under the United States Constitution, with *216 three separate opinions reaching their conclusions by relying on different Fourth Amendment doctrines.
¶ 83. Jones is instructive in the instant case. The Jones majority opinion, authored by Justice Scalia and joined by four other Justices, held that the attachment of the GPS device constituted a trespass onto the defendant's property.[39] Justice Alito, in a concurrence joined by three other Justices, asserted that extensive recording of an individual's location "impinges on expectations of privacy."[40] Justice Sotomayor joined the majority opinion relying on trespass law but wrote a separate concurrence, asserting that although trespass doctrine settled the case in Jones, even short-term monitoring of an individual's location implicates the right to privacy.[41] Thus, five Justices viewed the GPS device and its tracking of an individual's location as impinging on expectations of privacy.
¶ 84. Our case law also recognizes that government access to data stored on cell phones[42] and personal computers[43] constitutes a search within the meaning of the Constitutions. Thus, even if law enforcement officers have consent to search an area, "an independent analysis" must be performed to determine whether a personal electronic device can also be searched.[44]
*217 ¶ 85. I agree with the statements in Justice Prosser's lead opinion in Subdiaz-Osorio on the importance of privacy and its relationship to our modern, interconnected, electronic-device-mediated world. "Privacy is a pillar of freedom."[45] "[P]rivacy serves more than the individual; it is an integral component of a well-ordered society."[46] "[Pjrivacy must not become a legal fiction."[47] "[EJfforts to access the information in our electronic devices invade and expose the marrow of our individuality."[48] I, like Justice Prosser, am "mindful of the pervasiveness of wireless technology and of our citizens' concern for their privacy .. . ,"[49]
¶ 86. As the United States Supreme Court recently noted in Riley, 134 S. Ct. at 2494-95, cell phones involve a privacy interest far beyond what the Founders envisioned:
Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans "the privacies of life," [Boyd v. United States, 116 U. S. 616, 625 (1886).] The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought.
¶ 87. In light of these twenty-first-century privacy concerns and our existing case law holding that law enforcement's access to an individual's electronic data for information about the individual's location constitutes a search within the meaning of the Consti *218 tutions, why do the majority opinion in Tate and Justice Prosser's lead opinion in Subdiaz-Osorio hedge their bets? Indeed, Justice Roggensack’s concurrence in Subdiaz-Osorio chides Justice Prosser's lead opinion in Subdiaz-Osorio for daring to even insinuate that a privacy interest might exist in cell phone location data.[50]
¶ 88. The majority opinion in Tate and Justice Prosser's lead opinion in Subdiaz-Osorio assert that they choose not to decide whether the accessing of cell phone location data constituted searches within the meaning of the Constitutions because of "caution" as urged by the United States Supreme Court in City of Ontario, Cal. v. Quon, 560 U.S. 746, 759 (2010). Tate, majority op., ¶ 26; Subdiaz-Osorio, 2014 WI 87, ¶ 64 (Prosser, J., lead op.). Justice Prosser's lead opinion in Subdiaz-Osorio recites language from Quon stating that "[a] broad holding concerning employees' privacy expectations vis-a-vis employer-provided technological equipment might have implications for future cases that cannot be predicted." Subdiaz-Osorio, 2014 WI 87, ¶ 64 (Prosser, J., lead op.) (quoting Quon, 560 U.S. at 760).
¶ 89. Contrary to the hand-wringing of the majority opinion in Tate and Justice Prosser's lead opinion in Subdiaz-Osorio, recognizing a privacy interest in cell phone location data in the present cases does not establish far-reaching premises that define the existence and extent of privacy expectations for all technology. The court would establish only that government access to cell phone location data by the means used in these cases constitutes a search within the meaning of the Constitutions.
¶ 90. Technology does change rapidly, but the caution urged by Quon should hedge in favor of our *219 protecting privacy in the fact situations presented to us. Caution should steer us to follow existing Wisconsin case law already recognizing that government tracking of an individual's cell phone location data constitutes a search.
¶ 91. Regardless of whether one applies the trespass doctrine or the reasonable expectation of privacy doctrine of Fourth Amendment jurisprudence, law enforcement access to the defendants' cell phone location data in both Tate and Subdiaz-Osorio constitutes a search within the meaning of the Constitutions.
¶ 92. I nonetheless analyze both cases through the Fourth Amendment lenses of both the trespass doctrine and the reasonable expectation of privacy doctrine.
II
¶ 93. Under the trespass doctrine, when the government intrudes upon private property, even if the intrusion is small, it has performed a search within the meaning of the Constitutions.[51]
¶ 94. The Jones majority opinion held that when law enforcement "physically occupied private property for the purpose of obtaining information," a trespassory search occurred for Fourth Amendment purposes. Jones, 132 S. Ct. at 949-51.
¶ 95. As Justice Alito notes in his concurrence in Jones, "some [courts] have held that even the transmission of electrons that occurs when a communication is sent from one computer to another is enough" to constitute a trespass.[52]
*220 ¶ 96. The defendant's cell phone is private personal property, a constitutionally protected personal "effect".[53] A physical intrusion into that property with intent to find information creates a trespassory search.[54]
¶ 97. In both Tate and Subdiaz-Osorio, the police received the defendant's cell phone location data from the cell phone service provider, but nowhere in either case is it disclosed exactly how the cell phone location data was accessed.[55]
*221 ¶ 98. In both Tate and Subdiaz-Osorio, the government apparently electronically intruded into the defendant's cell phone by use of either a "ping" from the cell phone company[56] or a "stingray" device,[57] both of which implicate a trespassory search.
¶ 99. If the cell phone location data was accessed when the cell phone service provider "pinged" the phone, i.e., actively sent a signal to trigger the phone to reveal its location, the entry of an electronic signal into the phone implicated a trespass.
¶ 100. If the cell phone location data was accessed through law enforcement use of a "stingray" device as in Tate, such use also implicated a trespass.[58]
¶ 101. The exact methodology of the "stingray" is of some secrecy, but a general understanding of its functioning exists. Apparently the stingray device mimics a cell tower and sends a signal into the cell phone to trigger a response. The manufacturers of stingray devices will not discuss how the technology works. The *222 Wisconsin Department of Justice uses stingray technology but refuses to disclose the functioning or use of the stingray device.[59]
¶ 102. Even though the State has failed to disclose how the cell phone location data was obtained in the two cases, it appears that the government access to cell phone location data in both cases implicated trespassory intrusions. Nevertheless, the majority opinion in Tate and Justice Prosser's lead opinion in Subdiaz-Osorio do not consider trespass relevant to their inquiries.
¶ 103. The majority opinion in Tate simply ignores the possibility that the intrusion in the instant case constituted a trespassory search. The Tate majority opinion, ¶¶ 18-19, analyzes the case as one in which *223 "physical trespass on a defendant's property does not apply" or one involving "the absence of a trespass."
¶ 104. Justice Prosser's lead opinion in Subdiaz-Osorio asserts, without citation to any authority or analysis of the electronic intrusion, that the intrusion did not constitute a trespass.[60] Justice Prosser's lead opinion in Subdiaz-Osorio concludes that holding electronic manipulation to be a trespass "would be unnatural."[61]
¶ 105. Justice Prosser's lead opinion in Subdiaz-Osorio does not explicate what makes electronic manipulation "unnatural" and cites no cases or authority for its proposition, simply stating, ipse dixit, that "the present case falls under the category of a nontrespassory search. . . ."[62] The basis for the lead opinion's reasoning remains a mystery.
¶ 106. The court imprudently assumes that no trespass existed in the two cases. The determination of trespass should be based on the State's disclosure of how it obtained the information. Any electronic signal entering the individual's phone and modifying it or triggering a response in any way, however slight, implicates a trespassory search.
Ill
¶ 107. Justice Prosser's lead opinion in Subdiaz-Osorio correctly recites the two-part test set out in Katz v. United States, 389 U.S. 347 (1967), of the "reasonable expectation of privacy" standard for what constitutes a search within the meaning of the Constitution.[63]
*224 ¶ 108. Katz states that a search occurs when a person has both: a) a subjective expectation of privacy; and b) an expectation of privacy "that society is prepared to recognize as 'reasonable.'" Katz, 389 U.S. 347, 361 (Harlan, J., concurring).[64]
¶ 109. Justice Prosser's lead opinion in Subdiaz-Osorio explains why the individual defendant in that case had a subjective expectation of privacy in cell phone location data, Subdiaz-Osorio, 2014 WI 87, ¶ 53-64 (Prosser, J., lead op.), and why society recognizes an expectation of privacy in cell phone location data, Subdiaz-Osorio, 2014 WI 87, ¶¶ 42, 45, 65-68 (Prosser, J., lead op.). Yet, in the end, Justice Prosser's lead opinion in Subdiaz-Osorio refuses to recognize an individual's right to privacy in cell phone location data.
¶ 110. I would hold that the government access to cell phone location data in both cases violated both the subjective and objective reasonable expectations of privacy.
A
¶ 111. In order to determine whether government access to cell phone location data constitutes a search within the meaning of the Constitutions, a court addresses the first prong of the Katz test, namely that the person must have a subjective expectation of privacy in the area being searched.
¶ 112. Although individuals may be generally aware that their locations may be tracked through their cell phones, most do not realize the extent of tracking *225 possible[65] and reasonably do not expect the cell phone service provider to report their precise location to law enforcement officers. It does not comport with the reality of the modern telecommunications age that individuals lose their constitutional right to privacy in their location simply by purchasing a cell phone.
¶ 113. In accord with the comments in Justice Prosser's lead opinion in Subdiaz-Osorio,[66] I would hold that the defendants had a subjective reasonable expectation of privacy in the cell phone location data.
*226 ¶ 114. I turn to the questions of whether the cell phone service provider's contract or an individual's disclosure of his cell phone location data to the cell phone service provider (a third party) undermined the individual's subjective expectation of privacy in cell phone location data.
1
¶ 115. The cell phone service provider contract is referenced in Justice Prosser's lead opinion in Subdiaz-Osorio. The State argues that the contract removes the defendant's subjective expectation of privacy in his cell phone location data.
¶ 116. I conclude that the contract in question in Subdiaz-Osario was a contract of adhesion, a "take-it-or-leave-it" contract that the individual could not and did not negotiate.[67] Consequently, I would at a minimum construe ambiguous or vague terms against the drafter.[68]
¶ 117. Justice Prosser's lead opinion in Subdiaz-Osorio points out a variety of potentially unclear language in the defendant's cell phone service provider contract. Subdiaz-Osorio, ¶¶ 56-58 (Prosser, J, lead op.).
¶ 118. Justice Prosser's lead opinion in Subdiaz-Osorio also avers that such a complex and potentially confusing contract should not constitute the basis for consent to a search. Subdiaz-Osorio, 2014 WI 87, ¶ 59 (Prosser, J., lead op.). Why not? Law enforcement *227 officers are already expected to navigate a thicket of case law and facts when performing a consent search. The "totality of the circumstances" analysis when determining whether consent to a search has been properly given often involves careful weighing of a variety of legal relationships between family members, romantic partners, roommates, landlords and tenants, etc.[69]
¶ 119. I also look, as I have stated previously, to the reality of cell phone usage by the everyday purchaser of a cell phone: When accepting an adhesion contract to purchase cell phone service — an increasingly necessary component of everyday life — the purchaser is not bargaining for unfettered government access to the purchaser's cell phone location data.
¶ 120. The breadth of the data covered by the contract and the lack of clarity regarding the circumstances enabling the cell phone service provider to transmit the data to the government mandate that the court hold that the purchaser did not consent to government access to his or her cell phone location data.
*228 ¶ 121. Thus, I conclude that the defendant in Subdiaz-Osorio did not relinquish his subjective expectation of privacy or consent to a search based on the cell phone service provider contract.
2
¶ 122. I turn now to the "third-party doctrine," which is often broadly stated as follows: When an individual voluntarily provides information to a third party, the individual does not have a reasonable subjective expectation of privacy in the information.[70]
¶ 123. In the instant cases, the defendants' cell phones conveyed location information to the cell phone service provider, a third party, as a necessary component of the functioning of the phone. The defendants apparently cannot opt out of giving this information to the service provider.
¶ 124. Thus the very use of the cell phone, as well as the contract with the cell phone service provider, implicates the third-party doctrine.
¶ 125. Justice Roggensack's concurrence in Subdiaz-Osorio opines that the defendants in Tate and Subdiaz-Osorio had no reasonable expectation of pri *229 vacy because "a defendant typically retains no constitutional reasonable expectation of privacy in information conveyed to a third party." Subdiaz-Osorio, 2014 WI 87, ¶ 135 (Roggensack, J., concurring) (internal quotation marks & citation omitted); see also Tate, majority op., ¶ 25.
¶ 126. In the modern world, in which we regularly disclose information to third parties as part of everyday life, the third-party doctrine is ailing as a principle of law.
¶ 127. The third-party doctrine has been limited in scope since it was stated broadly in United States v. Miller, 425 U.S. 435, 443 (1976), a case that predates cellular phones. In Miller, the Court held that a bank depositor had no reasonable expectation of privacy in his or her bank records.
¶ 128. Smith v. Maryland, 442 U.S. 735 (1979), applied the reasoning of Miller, rejecting the argument that telephone subscribers harbor any general expectation that the numbers they dial, which are conveyed to the telephone company, will remain secret.
¶ 129. Miller and Smith represented the high-water mark for the third-party doctrine, which has receded ever since. Although the third-party doctrine has been defended vigorously by at least one prominent scholar, Orin Kerr, on the grounds that it provides clarity and ensures technological neutrality,[71] the Miller opinion was met with criticism as both overly broad and unsatisfactory in its failure to balance privacy rights of individuals against the law enforcement interest in investigating crimes.[72]
*230 ¶ 130. Since Miller and Smith, courts have used the third-party doctrine with decreasing frequency and have limited third-party cases to the facts at hand, leading some commentators to deem the doctrine either dead or of limited viability.[73]
*231 ¶ 131. Either ignoring or contravening the third-party doctrine, courts now recognize a reasonable expectation of privacy in certain types of information regardless of their disclosure to third parties, such as health records,[74] heat emanating from a house,[75] files entrusted to an attorney by a client,[76] tax records entrusted to a tax preparer,[77] or e-mail records.[78]
¶ 132. Justice Sotomayor got it right in her concurrence in Jones, 132 S. Ct. at 957, which casts doubt on the continued viability of a broad third-party doctrine in the digital age:
This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks. People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers.....I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But *232 whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy. I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.[79]
¶ 133. Although Justice Roggensack's concurrence in Subdiaz-Osorio reproaches Justice Prosser's lead opinion in Subdiaz-Osorio for "question[ing] the continued viability of the third party disclosure doctrine itself,"[80] the viability of the third-party disclosure doctrine is already questioned by existing case law and by Justice Sotomayor's concurrence in Jones, which the Tate majority opinion cites favorably.[81] Indeed, the Eleventh Circuit Court of Appeals has rejected the use of the third-party doctrine in evaluating whether government access to cell phone location data was a search, reasoning that because the defendant probably had no idea that he was allowing the cell phone provider to follow his movements, he "has not voluntarily disclosed his cell site location information to the provider in such a fashion as to lose his reasonable expectation of privacy." Davis, 2014 WL 2599917 at *10.
¶ 134. The ABA standards for law enforcement access to third-party records, cited favorably by Justice Roggensack's concurrence in Subdiaz-Osorio,[82] advocate a finer-grained approach to data disclosed to third *233 parties, rejecting a broad third-party doctrine in favor of differing protections for differing levels of expected privacy in data.[83]
¶ 135. I conclude that neither defendant lost his expectation of privacy in his cell phone location data simply because the location data was disclosed to the cell phone service provider. People do not buy cell phones to have them serve as government tracking devices.
B
¶ 136. For several reasons I conclude that society recognizes a reasonable expectation of privacy in an individual's cell phone location data.
¶ 137. First, the Wisconsin GPS case law (.Brereton)[84] has recognized an individual's subjective expectation of privacy in the individual's location and has declared that government access to GPS location data is a search within the meaning of the Constitutions.[85] Justice Sotomayor's concurrence in Jones similarly recognizes that even short-term GPS monitoring can reveal a wealth of information about a person's private behavior that he or she chooses not to expose to the world at large and that society should protect this choice.[86]
¶ 138. Second, in addition to the case law determining that government access to an individual's GPS location data is a violation of an individual's objective reasonable expectation of privacy, state and federal laws *234 have long protected individual communications and records disclosed to third parties from government access.
¶ 139. Our statutes recognize that individuals have a privacy interest in electronic and communications data, including oral, electronic, and wire communications;[87] dialed phone numbers;[88] and other records stored by communications services, such as name, address, session times and durations, billing information, etc.[89]
¶ 140. Third, society recognizes an individual's subjective reasonable expectation of privacy in location data regardless of whether the tracking is in public or private spaces.
¶ 141. The majority opinion in Tate suggests that tracking of cell phone location in Tate required a warrant "because the tracking led law enforcement to discover Tate's location within his mother's home."[90] The Tate majority opinion cites United States v. Knotts, 460 U.S. 276, 281 (1983), and State v. Sveum, 2010 WI 92, ¶ 79, 328 Wis. 2d 369, 787 N.W.2d 317 (Ziegler, J., concurring) for the proposition that tracking in public places does not constitute a search. Tate, majority op., ¶ 23.
¶ 142. Yet the facts of Tate and Subdiaz-Osorio demonstrate that the public/private space distinction *235 has become blurry. In Tate, when law enforcement officers initiated the tracking, they did not know whether the cell phone would be in public or private areas. Stingray devices owned by law enforcement gather location information about a cell phone whether it is in a public or private space. Similarly, the law enforcement officers did not know in Subdiaz-Osorio whether the defendant would be on a public highway or in a private residence (or similarly protected space, e.g., a hotel room).
¶ 143. True, in older jurisprudence, the United States Supreme Court distinguished between police surveillance of location in which the tracking device entered a home and surveillance in which the tracking device monitored movements only in public spaces. Compare Knotts, 460 U.S. at 281-83 (no Fourth Amendment violation when beeper surveillance on a vehicle tracked the vehicle on public streets and highways) with United States v. Karo, 468 U.S. 705, 714 (1984) (warrant was required to use a beeper to monitor the location of a container that was inside a vehicle on public roads, and then moved inside a private space).
¶ 144. This distinction between tracking in public and private spaces is eroded in the case of cell phone location data, which can be used to track movements across both public and private spaces.
¶ 145. This difficulty does not erode core privacy protections of residences. In Tate, upon determining the location of the phone, law enforcement officers entered the home of the defendant's mother. Entry into the home was a search separate and distinct from law enforcement's access to the cell phone location data. The warrantless entry into the home was not covered by the warrant in Tate, which authorized the officers to search only for the location data. Rather, the warrant- *236 less entry into the home was based on consent, an exception to the warrant requirement.[91] Simply because new technology reveals new areas of privacy does not mean that existing privacy interests are lost.[92]
¶ 146. Fourth, the Wisconsin legislature has recognized the public's reasonable expectation of privacy in cell phone location data. The Wisconsin legislature has recently enacted 2013 Wis. Act 375, creating Wis. Stat. § 968.373 (2013-14), with support across ideological and partisan lines.[93]
¶ 147. Newly enacted Wis. Stat. § 968.373, reprinted as an appendix, contains protections for location data from wireless or mobile devices. Subsection 968.373(2) explicitly prohibits law enforcement from identifying or tracking the location of a communications device without first obtaining a warrant as defined by the statute:
PROHIBITION. Except as provided in sub. (8) [the statutory emergency exception], no investigative or law enforcement officer may identify or track the location of a communications device without first obtaining a warrant under sub. (4).
By creating this statute, the Wisconsin legislature has reflected society's willingness to recognize the individual's subjective expectation of privacy.
*237 ¶ 148. Although the new legislation post-dates the searches in Tate and Subdiaz-Osorio, this court has examined legislation not applicable to the case before it to help us understand the state's public policy. See Kimble v. Land Concepts, Inc., 2014 WI 21, ¶ 65 n.24, 353 Wis. 2d 377, 845 N.W.2d 395 ("While the statute is not applicable to this case, it is nonetheless appropriate to consider the legislature's judgment of a reasonable disparity of punitive to compensatory damages."); McGarrity v. Welch Plumbing Co., 104 Wis. 2d 414, 427, 312 N.W.2d 37 (1981) (interpreting purpose of child labor laws based on later enactments on the same topic).
¶ 149. For all these reasons, I conclude that society is willing to recognize as reasonable and protect individuals' subjective reasonable expectation of privacy in cell phone location data.
IV
¶ 150. Because I conclude that in both Tate and Subdiaz-Osorio the government's access to the defendant's cell phone location data was a search within the meaning of the Constitutions, the warrant requirement applies. Thus, law enforcement needed a valid warrant to access the defendants' cell phone location data. In Tate, no warrant was obtained in compliance with the state statutes. No warrant was obtained at all in Subdiaz-Osorio.[94]
*238 ¶ 151. Our state legislature has promulgated statutes governing search warrants since 1849.[95]
¶ 152. Existing statutes governing warrants apply directly to a search for cell phone location data held by a cell phone provider, as the Tate majority opinion concedes.[96] The Tate majority opinion states that existing warrant statutes, Wis. Stat. §§ 968.12[97] and *239 968.135,[98] are clear and directly on point, and discusses these statutes and the important protections they provide. Tate, majority op., ¶¶ 45-50.
*240 ¶ 153. Indeed, the Tate majority opinion acknowledges that the circuit court's order for such data "should have" complied with the statutes governing warrants and governing subpoenas for documents in criminal cases, Wis. Stat. §§ 968.12 and 968.135, and that these statutes "express legislative choices about procedures to employ for warrants and criminal subpoenas." Tate, majority op., ¶¶ 49-51.[99]
¶ 154. Despite its acknowledgement of the existence of statutes directly applicable to the circumstances in Tate, the Tate majority opinion asserts that failure to comply with these statutes does not invalidate the search warrant. Tate, majority op., ¶ 42. The majority opinion in Tate turns a blind eye to the failure of the warrant to comply with multiple requirements of Wis. Stat. § 968.135, which clearly governs the fact situation in Tate, instead asserting that "[n]o specific statutory authority is necessary" in the instant case.
¶ 155. If the statutes "express legislative choices," why does the Tate majority opinion rule that these legislative choices require only compliance with the "spirit" of the statute rather than compliance with the text of the statute? Tate, majority op., ¶¶ 2, 51.
*241 ¶ 156. The Tate majority opinion assures us that, despite compliance "in spirit" rather than actual compliance with the text, "[the defendant] was not deprived of Wis. Stat. § 968.135's safeguards." Tate, majority op., ¶ 50.[100]
¶ 157. Yet the warrant in Tate failed to comply with almost all of the statutory requirements of the subpoena statute. Wisconsin Stat. § 968.135 requires that "[t]he documents shall be returnable to the court which issued the subpoena." The order in the instant case does not mention the return of any of the data recovered to the circuit court.
¶ 158. Wisconsin Stat. § 968.135 requires that "[mjotions to the court, including, but not limited to, motions to quash or limit the subpoena, shall be addressed to the court which issued the subpoena." The order in the instant case never provided any opportunity for motions to the court, because it was immediately ordered to "be sealed until otherwise ordered by the court."
¶ 159. Wisconsin Stat. § 968.135 does not authorize the sealing of subpoenas. The circuit court sealed documents, relying on the statute that authorizes the sealing of orders for pen registers or trap-and-trace devices.[101] The instant case did not involve either a pen register or trap-and-trace device.
¶ 160. These defects should have rendered the warrant invalid under Wis. Stat. § 968.135.
¶ 161. To avoid this result, the Tate majority opinion devises a new rule: A statute directly govern *242 ing a warrant in the particular circumstances of a case need not be followed.
¶ 162. Tatés new rule ignores the longstanding jurisprudence in this state. When a statute exists governing the warrant at issue, it must be followed unless the legislature expressed its intent otherwise. If the statutory requirements are not met, the warrant is invalid.[102] If no statute covers the search in question, law enforcement may seek a warrant if the warrant would have been permissible at common law. See Meek v. Pierce, 19 Wis. 318 (*300), 322 (*303) (1865).[103] How will the majority opinion in Tate apply to the new statute directly governing law enforcement access to cell phone location data?
¶ 163. For the reasons set forth, I conclude that the law enforcement officers in Tate had to comply with Wis. Stat. § 968.135 to obtain a valid warrant to access the defendant's cell phone location data. They did not. Consequently, I conclude that no valid warrant was obtained in Tate.
$' ‡ ‡ ‡
*243 ¶ 164. Unlike the majority opinion in Tate and Justice Prosser's lead opinion in Subdiaz-Osorio, I conclude that government access to cell phone location data in the present cases is a search within the meaning of the Constitutions that requires a warrant, and that the warrant must comply with the existing directly applicable statutes. The warrant in Tate did not comply with the existing statutes and is invalid. No warrant was obtained in Subdiaz-Osorio.
¶ 165. Because the various writings in Tate and Subdiaz-Osorio fail to protect privacy, I write in dissent.
¶ 166. I am authorized to state that Justice ANN WALSH BRADLEY joins Parts I-IV of this dissent.
*244 APPENDIX
[[Image here]]
*245 [[Image here]]
*246 [[Image here]]

 State v. Earls, 70 A.3d 630, 631-32 (N.J. 2013).

 State v. Tate, 2014 WI 89, 357 Wis. 2d 172, 849 N.W.2d 798.

 State v. Subdiaz-Osorio, 2014 WI 87, 357 Wis. 2d 41, 849 N.W.2d 748.

 The Fourth Amendment to the United States Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

 Article 1, Section 11 of the Wisconsin Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

 Riley v. California, 134 S. Ct. 2473, 2484 (2014).

 Earls, 70 A.3d at 638.

 Riley, 134 S. Ct. at 2484. The Riley Court additionally noted that "nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower." Id. at 2490.

 See Earls, 70 A.3d at 632. See also Riley, 134 S. Ct. at 2489 ("Cell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person.... [Cell phones] could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers.").

 See Noam Cohen, It's Tracking Your Every Move and You May Not Even Know, N.Y. Times, Mar. 26, 2011, at Al.

 Riley, 134 S. Ct. at 2490 (citing United States v. Jones, 132 S. Ct. 945 (2012) (Sotomayor, J., concurring)).

 "[W]e promote clarity in the law of search and seizure and provide straightforward guidelines to governmental officers who must apply our holdings." State v. Williams, 2012 WI 59, ¶ 25, 341 Wis. 2d 191, 814 N.W.2d 460.

 Justices Ann Walsh Bradley and N. Patrick Crooks agree with this conclusion.

 "To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication." Katz v. United States, 389 U.S. 347, 352 (1967).

 See, e.g., United States v. Davis, 754 F.3d 1205, 2014 WL 2599917, at *9 (11th Cir. 2014) ("[I]t is unlikely that cell phone customers are aware that their cell phone providers collect and store historical location information.") (quoting In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n Serv. To Disclose Records to Gov't, 620 F.3d 304, 317 (3d Cir. 2010)); Earls, 70 A. 3d at 632.

 State v. Sanders, 2008 WI 85, ¶ 27, 311 Wis. 2d 257, 752 N.W.2d 713; State v. Payano-Roman, 2006 WI 47, ¶ 30, 290 Wis. 2d 380, 714 N.W.2d 548.

 I refer to the court order issued in Tate as a "warrant," as does the Tate majority opinion. The applicable statute refers to a court issuing a "subpoena" requiring the production of documents. Wis. Stat. § 968.135.

 "Privacy comes at a cost." Riley, 134 S. Ct. at 2493.

 Tate, majority op., ¶¶ 2, 26; Subdiaz-Osorio, 2014 WI 87, ¶¶ 9, 70 (Prosser, J., lead op.). But see Subdiaz-Osorio, 2014 WI *207 87, ¶ 132 (Roggensack, J., concurring) (accusing Justice Prosser's lead opinion in Subdiaz-Osorio of not merely assuming the issue of the reasonable expectation of privacy but in effect deciding the issue).

 See Riley, 134 S. Ct. 2473 (cited in Tate, majority op., ¶ 20 n.11; in Subdiaz-Osorio, 2014 WI 87, ¶ 47 n.23 (Prosser, J., lead op.)); Katz, 389 U.S. at 353 (cited in Tate, majority op., ¶¶ 19-21; in Subdiaz-Osorio, 2014 WI 87, ¶¶ 51-52, 65-66 (Prosser, J., lead op.); in Subdiaz-Osorio, 2014 WI 87, ¶ 3 (Roggensack, J., concurring)); Jones, 132 S. Ct. 945 (2012) (cited in Tate, majority op., ¶¶ 17-25; in Subdiaz-Osorio, 2014 WI 87, ¶¶ 43, 48, 51 (Prosser, J., lead op.); in Subdiaz-Osorio, 2014 WI 87, ¶ 135 (Roggensack, J., concurring); State v. Brereton, 2013 WI 17, 345 Wis. 2d 563, 826 N.W.2d 369 (cited in Tate, majority op., ¶¶ 16-18, 40; in Subdiaz-Osorio, 2014 WI 87, ¶¶ 38, 49 (Prosser, J., lead op.); State v. Sveum, 2010 WI 92, 328 Wis. 2d 369, 787 N.W.2d 317 (cited in Tate, majority op., ¶¶ 14, 23, 28, 30,40-43; in Subdiaz-Osorio, 2014 WI 87, ¶ 49 (Prosser, J., lead op.)).

 See Subdiaz-Osorio, 2014 WI 87, ¶¶ 131-132 (Roggensack, J., concurring) (criticizing Justice Prosser's lead opinion in Subdiaz-Osorio for "elaborate[ing] too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear"); Subdiaz-Osorio, ¶ 50 (Prosser, J., lead op.) (noting that Tate shares similarities with Subdiaz-Osorio even though it is ultimately decided on other issues).

 In footnotes 23 through 30,1 consolidate and summarize the position of each opinion in Tate and Subdiaz-Osorio regarding particular topics.

 For discussions of whether a search existed, see:
Tate, majority op., ¶ 26: Assumes, without deciding, that there was a search.
Subdiaz-Osorio, 2014 WI 87, ¶ 9 (Prosser, J., lead op.): Assumes, without deciding, that there was a search but hints strongly that a search existed.
Subdiaz-Osorio, 2014 WI 87, ¶ 89 (Bradley, J., concurring), ¶ 116 (Crooks, J., concurring): Determine that there was a search.
Subdiaz-Osorio, 2014 WI 87, ¶¶ 131-137 (Roggensack, J., concurring): Criticizes Justice Prosser's lead opinion for elaborating too fully on right to privacy in cell phone location data.
Subdiaz-Osorio, 2014 WI 87, ¶ 139-143 (Ziegler, J., concurring): Joining Justice Roggensack's concurrence, and requesting additional briefing on whether a search existed.
Tate, Chief Justice Abrahamson's dissent, ¶ 61: Yes, access to cell phone location data is a search. See also Subdiaz-Osorio, 2014 WI 87, ¶ 155 (Abrahamson, C.J., dissenting).

 For discussions of whether a trespass existed, see:
*209 Tate, majority op., ¶¶ 18-20: Discusses trespass but refers to the search only as "nontrespassory."
Subdiaz-Osorio, 2014 WI 87, ¶¶ 48-50 (Prosser, J., lead op.): Trespass analysis would be "unnatural."
Tate, Chief Justice Abrahamson's dissent, ¶¶ 101-102: State does not disclose how information was obtained; appears to be a trespass. See also Subdiaz-Osorio, 2014 WI 87, ¶ 168 (Abraham-son, C.J., dissenting).

 For discussions of whether the cell phone contract created consent to access the cell phone location data, see:
Tate, majority op., ¶ 22: Defendant might consent through purchase of cell phone.
Subdiaz-Osorio, 2014 WI 87, ¶¶ 53-63 (Prosser, J., lead op.): Consent through cell phone purchase contract was invalid.
Subdiaz-Osorio, 2014 WI 87, ¶¶ 133-135 (Roggensack, J., concurring): Questions J. Prosser's lead opinion regarding contract.
Tate, Chief Justice Abrahamson's dissent, ¶ 116-121: Adhesion contract will not be enforced to waive constitutional rights. See also Subdiaz-Osorio, 2014 WI 87, ¶ 168 (Abrahamson, C.J., dissenting).

 For discussions of the impact of third-party doctrine, see:
Tate, majority op., ¶¶ 24-25: Third-party doctrine may need reevaluation.
Subdiaz-Osorio, 2014 WI 87, ¶ 134-135 (Roggensack, J., concurring): Questions whether expectation of privacy exists in third-party records.
Tate, Chief Justice Abrahamson's dissent, ¶¶ 122-135: Third-party doctrine in inapplicable to cell phone location data.

 For discussions of whether society recognizes a reasonable expectation of privacy, see:
Tate, majority op., ¶¶ 2,16-25: Expectation of privacy may be lower for cell phone location, especially in a public area; expectation of privacy was dependent on the cell phone's location in a home.
Subdiaz-Osorio, 2014 WI 87, ¶¶ 65-68 (Prosser, J., lead op.): Public expects privacy in cell phone location data and worries about invasion of privacy.
Subdiaz-Osorio, 2014 WI 87, ¶ 134-135 (Roggensack, J., concurring): Questions whether expectation of privacy exists in third-party records.
Tate, Chief Justice Abrahamson's dissent, ¶¶ 136-149: Case law, public policy, and Wisconsin legislation point to society recognizing reasonable expectation of privacy in cell phone location data. See also Subdiaz-Osorio, 2014 WI 87, ¶ 168 (Abrahamson, C.J., dissenting).

 For discussions of the warrant requirement, see:
Tate, majority op., ¶¶ 33-50: Warrant did not comply with Wis. Stat. § 968.135, subpoena for third-party information. Non-statutory warrant met constitutional requirements. Non-statutory warrants met "spirit11 of warrant statutes.
Subdiaz-Osorio, 2014 WI 87, ¶ 5 n.2 (Prosser, J., lead op.): No warrant at issue, but warrants must meet Fourth Amendment and statutory requirements.
Subdiaz-Osorio, 2014 WI 87, ¶ 89 (Bradley, J., concurring): A warrant was needed and the State's warrant failed to comply in either case.
Subdiaz-Osorio, 2014 WI 87, ¶ 118 (Crooks, J., concurring): A warrant was needed but the good-faith exception applied.
*211 Tate, Chief Justice Abrahamson's dissent, ¶¶ 150-163: State fails to comply with statutory warrant requirements. Warrant was invalid.
See also Subdiaz-Osorio, 2014 WI 87, ¶ 168 (Abrahamson, C.J., dissenting).

 For discussions of exigent circumstances, see:
Tate: Exigent circumstances not at issue.
Subdiaz-Osorio, 2014 WI 87, ¶¶ 69-81 (Prosser, J., lead op.): Exigent circumstances exception to warrant requirement was satisfied.
Subdiaz-Osorio, 2014 WI 87, ¶ 89 (Bradley, J., concurring): there were no exigent circumstances.
Subdiaz-Osorio, 2014 WI 87, ¶ 118 (Crooks, J., concurring): there were no exigent circumstances.
Subdiaz-Osorio, 2014 WI 87, ¶ 130 (Roggensack, J., concurring): Law enforcement acted reasonably under the Fourth Amendment due to exigent circumstances.
Subdiaz-Osorio, 2014 WI 87, ¶¶ 169-208 (Abrahamson, C.J., dissenting): State fails to meet its burden to show exigent circumstances.

 For discussions of the Miranda right to an attorney, see:
Tate: Miranda rights not at issue.
Subdiaz-Osorio, 2014 WI 87, ¶¶ 82-87 (Prosser, J., lead op.): Defendant failed to invoke unequivocally right to an attorney.
Subdiaz-Osorio, 2014 WI 87, ¶ 89 (Bradley, J., concurring): Defendant successfully invoked Miranda right.
Subdiaz-Osorio 2014 WI 87, ¶ 109 (Crooks, J., concurring); id., ¶ 130 (Roggensack, J., concurring): Defendant failed to invoke unequivocally right to an attorney.
Subdiaz-Osorio, 2014 WI 87, ¶¶ 209-219 (Abrahamson, C.J., dissenting): A reasonable person would understand Subdiaz-Osorio to have invoked his Miranda right.

 The two cases raise numerous additional issues that I do not address, including the applicability of federal statutes, the good-faith exception, and the proper standard for reviewing and remedying an illegal search of cell phone location data.
Justice Crooks' concurrence in Subdiaz-Osorio asserts that an illegal warrantless search occurred, Subdiaz-Osorio, 2014 WI 87, ¶¶ 125-128 (Crooks, J., concurring), but that the good-faith exception applies, and that the evidence should not have been excluded. As I explain in Parts I-IV our state's case law already set forth the need for a warrant and the statutes provide procedures for obtaining a warrant. These rules of law existed at the time that the officers initiated the search in the instant cases.
I am unconvinced that the usual harmless-error analysis is the proper approach in Tate and Subdiaz-Osorio. See Subdiaz-Osorio, 2014 WI 87, ¶¶ 97-105 (Bradley, J., concurring) (applying harmless-error analysis in Subdiaz-Osorio). When illegally obtained cell phone location data forms the entire basis for the apprehension and arrest of the defendant, rather than evidence of the crime, the usual harmless-error analysis appears to be a poor fit.

 In Earls, 70 A.3d 630, although the New Jersey Supreme Court recognized the difficulty of calculating exactly what level of privacy society expects in its technological products, the court declared that individuals have a reasonable expectation of *213 privacy in their cell phone location data, and therefore the police must obtain a search warrant before accessing that information.
[Olur focus belongs on the obvious: cell phones are not meant to serve as tracking devices to locate their owners wherever they may be. People buy cell phones to communicate with others, to use the Internet, and for a growing number of other reasons. But no one buys a cell phone to share detailed information about their whereabouts with the police.
Earls, 70 A.3d at 643.
Similarly, the Massachusetts Supreme Judicial Court has held that an individual's privacy interest in cell phone location data is one that society accepts as reasonable, and that law enforcement's request for cell phone location data from an individual's cell phone provider is a search requiring Fourth Amendment protections. Commonwealth v. Augustine, 4 N.E.3d 846 (Mass. 2014).
Recently, the federal Eleventh Circuit Court of Appeals has also held that cell phone location data is within society's reasonable expectation of privacy. See United States v. Davis, 754 F.3d 1205, 2014 WL 2599917 (11th Cir. 2014).

 Tate, majority op., ¶ 20 n.ll; Subdiaz-Osorio, 2014 WI 87, ¶ 47 n.23 (Prosser, J., lead op.).

 Subdiaz-Osorio, 2014 WI 87, ¶ 109 (Crooks, J., concurring).

 State v. Brereton, 2013 WI 17, 345 Wis. 2d 563, 826 N.W.2d 369, cert. denied, 134 S. Ct. 93 (U.S. 2013).

 Although the court is not bound by a party's concession of law, both the State's and defendant's briefs in Tate assert that Brereton, 345 Wis. 2d 563, makes clear that the GPS tracking was a search within the meaning of the Constitutions and required a warrant. Brief of Plaintiff-Respondent at 14r-15; Brief and Appendix of Defendant-Appellant-Petitioner at 24-25.

 Brereton, 345 Wis. 2d 563, ¶ 34 (internal quotation marks omitted).

 Id. (citing Jones, 132 S. Ct. at 954).
The Brereton court clearly stated numerous times that "the use of a GPS device constituted a search ... ," Brereton, 345 Wis. 2d 563, ¶ 43, and that "the privacy interest implicated by the GPS search required judicial authorization," id., ¶ 44.

 Jones, 132 S. Ct. at 949-54.

 Jones, 132 S. Ct. at 964 (Alito, J., concurring in the judgment).

 Jones, 132 S. Ct. at 954-57 (Sotomayor, J., concurring).

 State v. Carroll, 2010 WI 8, ¶ 27, 322 Wis. 2d 299, 778 N.W.2d 1. See Riley, 134 S. Ct. 2473 (requiring warrant for officers to search the cell phone of an arrestee).

 State v. Sobczak, 2013 WI 52, 347 Wis. 2d 724, 833 N.W.2d 59, cert. denied sub nom. Sobczak v. Wisconsin, 134 S. Ct. 626 (2013).

 Sobczak, 347 Wis. 2d 724, ¶ 30.

 Subdiaz-Osorio, 2014 WT 87, ¶ 40 (Prosser, J., lead op.).

 Id., ¶ 41 (Prosser, J., lead op.).

 Id., ¶ 40 (Prosser, J., lead op.).

 Id., ¶ 42 (Prosser, J., lead op.).

 id, ¶ 45 (Prosser, J., lead op.).

 Subdiaz-Osorio, 2014 WI 87, ¶¶ 131-132, 139-137 (Roggensack, J., concurring).

 See Silverman v. United States, 365 U.S. 505, 512 (1961) ("mildest and least repulsive" trespass is still a search).

 Jones, 132 S. Ct. at 962 (Alito, J., concurring) (citing *220 CompuServe, Inc. v. Cyber Promotions, Inc., 962 F. Supp. 1015, 1021 (S.D. Ohio 1997); Thrifty-Tel, Inc. v. Bezenek, 46 Cal. App. 4th 1559, 1566 n.6 (1996)).
See also Jones, 132 S. Ct. at 953 ("Situations involving merely the transmission of electronic signals without trespass would remain subject to Katz analysis."). The lead opinion in Subdiaz-Osorio quotes this language for the proposition that applying trespass doctrine to electronic data would be "unnatural," see Subdiaz-Osorio, 2014 WI 87, ¶ 48 & n.24 (Prosser, J., lead op.), but Jones does not foreclose that transmission of electronic signals may at times constitute a trespass.

 See Carroll, 322 Wis. 2d 299, ¶¶ 27-28 (treating a cell phone as a closed container).

 Courts have treated government intrusions into stored data on computers as trespasses to a chattel ("an effect" under the Fourth Amendment). See Sotelo v. DirectRevenue, LLC, 384 F. Supp. 2d 1219, 1230-32 (N.D. Ill. 2005) (asserting that intrusion into a computer causing damage to the computer was sufficient to state a claim for trespass to chattels); see also Theofel v. Farey-Jones, 359 E3d 1066, 1072-73 (9th Cir. 2004) (analogizing violation of the federal Stored Communications Act with the common law of trespass); International Ass'n of Machinists and Aeropsace Workers v. Werner-Masuda, 390 F. Supp. 2d 479,495 (D. Md. 2005) (noting that federal courts treat computer hackers as "electronic trespassers").

 "It is not clear from the record exactly how law enforcement used cell site information ... ." Tate, majority op., ¶ 8.
The circuit court order issued in Tate required that the service provider, U.S. Cellular, "shall initiate a signal to deter *221 mine the location of the subject's mobile device on the service provider's network or with such other reference points as may be reasonable ...."

 Tate, majority op., ¶¶ 1, 7; Subdiaz-Osorio, 2014 WI 87 ¶ 45 n.19 (Prosser, J., lead op.).

 Tate, majority op., ¶¶ 1, 7, 9.

 A stingray works by mimicking a cellphone tower, getting a phone to connect to it and measuring signals from the phone. It lets the stingray operator 'ping,' or send a signal to, a phone and locate it as long as it is powered on, according to documents reviewed by the Journal. The device has various uses, including helping police locate suspects and aiding search-and-rescue teams in finding people lost in remote areas or buried in rubble after an accident.
Jennifer Valentino-Devries, "Stingray" Phone Tracker Fuels Constitutional Clash, Wall St. J., Sept. 22, 2011, available at http://online.wsj.com/news/articles/SB100014240531119041946 04576583112723197574 (last visited July 14, 2014).

 See Eric Litke, State Cops Can Track Residents' Cellphones, Oshkosh Northwestern, Mar. 28, 2014, available at http://www.thenorthwestern.com/article/20140331/OSH0198/30 3290107/State-cops-can-track-residents-cellphones (last visited July 14, 2014).
Increasingly, local and state law enforcement officers are tapping into cell phone data using a variety of tools including stingray devices. Use of these secretive tools has raised privacy concerns in many jurisdictions. See John Kelly, Cellphone Data Spying: It's Not Just the NSA, USA Today, June 10, 2014, available at http://www.usatoday.com /story/news/nation/ 2013/ 12/08/cellphone-data-spying-nsa-police/3902809/ (last visited July 14, 2014).
Additionally, the Obama administration has encouraged state and local law enforcement to withhold or heavily censor documents regarding the use of cell phone surveillance tools, increasingly intervening in routine state public records cases and criminal trials regarding use of the technology. See Jack Gillum & Eileen Sullivan, US Pushing Local Cops To Stay Mum on Surveillance, U.S. News & World Report, June 12, 2014, available at http://www.usnews.com/news/politics/articles/2014 /06/12/us-pushing-local-cops-to-stay-mum-on-surveillance (last visited July 14, 2014).

 Subdiaz-Osorio, 2014 WI 87, ¶ 50 (Prosser, J., lead op.).

 Id., ¶ 48 (Prosser, J., lead op.).

 Id., ¶ 49 (Prosser, J., lead op.).

 Id., ¶¶ 51-52 (Prosser, J., lead op.).

 The United States Supreme Court has acknowledged that the Katz test "has often been criticized as circular, and hence subjective and unpredictable." Kyllo v. United States, 533 U.S. 27, 34 (2001).

 If you have a cell phone in your pocket, then the government can watch you. At the government's request, the phone company will send out a signal to any cell phone connected to its network, and give the police its location. [In 2009] law enforcement agents pinged users of just one service provider — Sprint—over eight million times. The volume of requests grew so large that the 110-member electronic surveillance team couldn't keep up, so Sprint automated the process by developing a web interface that gives agents direct access to users' location data. Other cell phone service providers are not as forthcoming about this practice, so we can only guess how many millions of their customers get pinged by the police every year.
United States v. Pineda-Moreno, 617 F.3d 1120, 1125 (9th Cir. 2010) (Kozinski, J., dissenting) (citations omitted).
The Tate warrant approves collecting open-ended and undefined data from the cell phone service provider, such as: "any historical information law enforcement may request to include historical cell site information from 6/9/2009 through this order's duration ... ." The order's duration extends over a long period of time — 60 days — and requires that the cell phone service provider "shall provide all technical assistance necessary to accomplish this order and disclose the records and other information described herein twenty-four hours a day."
This surveillance goes far beyond the traditional scope of a search warrant, aided by technology that has now rendered broad searches practicable.

 Subdiaz-Osorio, 2014 WI 87, ¶¶ 53-61 (Prosser, J., lead op.).

 See Wis. Auto Title Loans v. Jones, 2006 WI 53, ¶ 52, 290 Wis. 2d 514, 714 N.W.2d 155 (quoting Acorn v. Household Int'l, Inc., 211 F. Supp. 2d 1160, 1168 (N.D. Cal. 2002)).

 "The principle that ambiguities are construed against the drafter is a deeply rooted doctrine of contract interpretation." Maryland Arms Ltd. P'ship v. Connell, 2010 WI 64, ¶ 44, 326 Wis. 2d 300, 786 N.W.2d 15 (internal quotation marks omitted).

 See, e.g., State v. Kieffer, 217 Wis. 2d 531, 577 N.W.2d 352 (1998) (requiring police to ask additional clarifying questions when third-party landowner's apparent authority to search the tenant-defendant's apartment was unclear); State v. Tomlinson, 2002 WI 91, 254 Wis. 2d 502, 648 N.W.2d 367 (determining that police could reasonably assume that 14 — year-old girl at the door of a residence had apparent authority to consent to its search even though they had no evidence that the girl was the resident's daughter); Sobczak, 347 Wis. 2d 724 (deeming it reasonable for police to assume that a defendant's girlfriend had actual authority to consent to a search of the defendant's laptop, even though the girlfriend was a houseguest and not a cotenant); State v. St. Germaine, 2007 WI App 214, 305 Wis. 2d 511, 740 N.W.2d 148 (holding that when a tenant-defendant did not object to the landlord's consent to search the entire residence, and when the police did not know that a particular room belonged to the tenant-defendant, the landlord had apparent authority to consent to the search).

 See United States v. Miller, 425 U.S. 435 (1976) (holding a bank depositor had no reasonable expectation of privacy in his or her bank records); Smith v. Maryland, 442 U.S. 735 (1979) (holding that use of a pen register, a device that records the phone numbers dialed by an individual, does not constitute a search under the reasonable expectation of privacy analysis).
Congress and many state legislatures, including the Wisconsin legislature, subsequently created a procedure for issuing pen registers that protects an individual's privacy interests. See 18 U.S.C. § 3123 (2006); Wis. Stat. §§ 968.34-.36. See also Right to Financial Privacy Act of 1978, 12 U.S.C §§ 3401-3421 (1980) (protections to prevent government access into private bank records without meeting specific requirements).

 See Orin Kerr, The Case for the Third-Party Doctrine, 107 Mich. L. Rev. 561 (2009).

 See Note, Government Access to Bank Records, 83 Yale L.J. 1439, 1464-65 (1974) (criticizing the doctrine as outdated, and asserting that denial of a privacy interest in third-party *230 records "leads to the anomalous conclusion that, while safeguarded against all others, the depositor's privacy would be nonexistent when the prying eye belongs to the government"); Albert W Alschuler, Interpersonal Privacy and the Fourth Amendment, 4 N. Ill. U. L. Rev. 1, 22 (1983) (noting that reactions to Miller were "overwhelmingly negative" and decrying the alarming breadth of the third-party doctrine announced therein); Matthew Tokson, Automation and the Fourth Amendment; 96 Iowa L. Rev. 581, 585-86 (2011) (criticizing the third-party doctrine as "problematic in an age where an ever-growing proportion of personal communications and transactions are carried out over the Internet," all accessible to third-party Internet service providers, among others).
Professor LaFave has joined others in criticizing the third-party doctrine. 1 Wayne R. LaFave, Search & Seizure § 2.7(c) (5th ed. 2012) (footnotes omitted):
The result reached in Miller is dead wrong, and the Court's woefully inadequate reasoning does great violence to the theory of Fourth Amendment protection the Court had developed in Katz.
The Court's assertion in Miller that there can be no protected Fourth Amendment interest where there is "neither ownership nor possession" is contrary to the purposes underlying the Fourth Amendment, the teachings of Katz, and the realities of modern-day life. Ownership and possession are property concepts which, the Court wisely concluded in Katz, "cannot serve as a talismanic solution to every Fourth Amendment problem," and which surely do not lead to the proper solution in this context. Unquestionably, the "Fourth Amendment's drafters were . . . concerned with privacy in the sense of control over information."

 See, e.g., Stephen E. Henderson, After United States v. Jones, After the Fourth Amendment Third Party Doctrine, 14 N.C. J.L. & Tech. 431 (2013) (reasoning that courts have been hesitant to apply the third-party doctrine in recent years, and attacking the doctrine as incongruent with modern culture).

 In Ferguson v. City of Charleston, 532 U.S. 67 (2001), the Court recognized that pregnant women had a privacy interest in collected urine samples and invalidated a program that shared samples given at a hospital with law enforcement. The dissent, authored by Justice Scalia, noted that the Court did not address the third-party doctrine.

 Kyllo, 537 U.S. 27.

 DeMassa v. Nunez, 770 F.2d 1505 (9th Cir. 1985).

 People v. Gutierrez, 222 P3d 925 (Colo. 2009).

 United States v. Warshak, 631 F.3d 266 (6th Cir. 2010) (asserting that an individual enjoys a reasonable expectation of privacy in e-mails vis-á-vis his or her internet service provider and that government agents violated the individual's Fourth Amendment rights by compelling disclosure of his emails from the internet service provider without a warrant).

 The third-party doctrine also arose in Riley, 134 S. Ct. at 2492-93. The Court did not adopt the government's argument to uphold the search based on the third-party doctrine as stated in Smith, 442 U.S. 735.

 Subdiaz-Osorio, 2014 WI 87, ¶ 135 (Roggensack, J., concurring).

 Tate, majority op., ¶ 25.

 Subdiaz-Osorio, 2014 WI 87, ¶ 135 (Roggensack, J., concurring).

 ABA Standards for Criminal Justice, Law Enforcement Access to Third Party Records Standard 25-4.1 & cmt., at 63 (3d ed. 2013).

 Brereton, 345 Wis. 2d 563.

 See ¶¶ 79-81, supra (discussing Brereton).

 Jones, 132 S. Ct. 945, 955-56 (2012) (Sotomayor, J., concurring).

 See Wis. Stat. § 968.31 (prohibiting the interception of wire, electronic, or oral communication, except as provided and authorized by judicial order)

 See Wis. Stat. § 968.34 (prohibiting any person, including law enforcement, from installing a pen register or trap-and-trace device absent a court order).

 See Wis. Stat. § 968.375 (creating statutory subpoenas for disclosure of certain information by electronic communications services and prohibiting disclosure unless the disclosure fits into certain exceptional categories).

 Tate, majority op., ¶ 2; see also id., ¶¶ 23, 51.

 The defendant in Tate disputed the issue of consent at the circuit court, but did not raise the issue in this court.

 See Kyllo, 533 U.S. at 37-40 (noting that although heat-imaging technology was novel, core protections of privacy in homes remained intact).

 Of the bill's 22 Assembly sponsors, 14 were Republicans and 8 were Democrats. The bill's two co-sponsors in the Senate were John Lehman (D-Racine) and Glenn Grothman (R-West Bend). It was also unanimously approved by the Wisconsin Assembly Committee on Judiciary.

 Justice Prosser's lead opinion in Subdiaz-Osorio does, however, comment on warrant requirements, although its precise meaning for courts and law enforcement is unclear:
A court order that meets the requirements of the Fourth Amendment may function as a warrant. State v. Tate, 2014 WI 89, ¶ 2 & n.4, 357 Wis. 2d 172, 849 N.W.2d 798; see also State v. Sveum, 2010 WI 92, ¶ 39, 328 Wis. 2d 369, 787 N.W.2d 317. However, when a statute provides procedures for obtaining a warrant in a given set *238 of circumstances, law enforcement should follow the statute to ensure that a search conducted under the circumstances contemplated by the statute does not violate a person's Fourth Amendment rights.
Subdiaz-Osorio, 2014 WI 87, ¶ 5 n.2 (Prosser, J., lead op.).

 See Wis. Stat. ch. 142, §§ 1-4 (1849).

 Tate, majority op., ¶¶ 45-50.

 Wisconsin Stat. § 968.12 states as follows:
Search warrant
(1) Description and issuance. A search warrant is an order signed by a judge directing a law enforcement officer to conduct a search of a designated person, a designated object or a designated place for the purpose of seizing designated property or kinds of property. A judge shall issue a search warrant if probable cause is shown.
(2) Warrant upon affidavit. A search warrant may be based upon sworn complaint or affidavit, or testimony recorded by a phonographic reporter or under sub. (3)(d), showing probable cause therefor. The complaint, affidavit or testimony may be upon information and belief.
(3) Warrant upon oral testimony, (a) General rule. A search warrant may be based upon sworn oral testimony communicated to the judge by telephone, radio or other means of electronic communication, under the procedure prescribed in this suhsection.
(h) Application. The person who is requesting the warrant shall prepare a duplicate original warrant and read the duplicate original warrant, verbatim, to the judge. The judge shall enter, verbatim, what is read on the original warrant. The judge may direct that the warrant be modified.
(c) Issuance. If the judge determines that there is probable cause for the warrant, the judge shall order the issuance of a warrant by *239 directing the person requesting the warrant to sign the judge's name on the duplicate original warrant. In addition, the person shall sign his or her own name on the duplicate original warrant. The judge shall immediately sign the original warrant and enter on the face of the original warrant the exact time when the warrant was ordered to be issued. The finding of probable cause for a warrant upon oral testimony shall be based on the same kind of evidence as is sufficient for a warrant upon affidavit.
(d) Recording and certification of testimony. When a caller informs the judge that the purpose of the call is to request a warrant, the judge shall place under oath each person whose testimony forms a basis of the application and each person applying for the warrant. The judge or requesting person shall arrange for all sworn testimony to he recorded either by a stenographic reporter or by means of a voice recording device. The judge shall have the record transcribed. The transcript, certified as accurate by the judge or reporter, as appropriate, shall be filed with the court. If the testimony was recorded by means of a voice recording device, the judge shall also file the original recording with the court.
(e) Contents. The contents of a warrant upon oral testimony shall be the same as the contents of a warrant upon affidavit.
(f) Entry of time of execution. The person who executes the warrant shall enter the exact time of execution on the face of the duplicate original warrant.
(4) Location of search. A search warrant may authorize a search to be conducted anywhere in the state and may be executed pursuant to its terms anywhere in the state.

 Wisconsin Stat. § 968.135 states as follows:
Subpoena for documents
Upon the request of the attorney general or a district attorney and upon a showing of probable cause under s. 968.12, a court shall issue a subpoena requiring the production of documents, as specified in s. 968.13(2). The documents shall be returnable to the court which issued the subpoena. Motions to the court, including, but not limited to, motions to quash or limit the subpoena, shall be addressed to the court which issued the subpoena. Any person who unlawfully refuses to produce the documents may be compelled to *240 do so as provided in ch. 785. This section does not limit or affect any other subpoena authority provided by law.

 Indeed, we made clear in State v. Popenhagen, 2008 WI 55, ¶ 84, 309 Wis. 2d 601, 749 N.W.2d 611, that "the objective of [the criminal subpoena statute, Wis. Stat.] § 968.135[,] is to allow the State to acquire and use documents while also ensuring that the State meets statutory requirements that protect the privacy interests of persons affected by the subpoena."
We further held in Popenhagen that failure to comply with the requirements of Wis. Stat. § 968.135 results in an invalid warrant and that such a violation justified suppression of evidence obtained by the invalid warrant. Popenhagen, 309 Wis. 2d 601, ¶ 97.

 Wisconsin Stat. § 968.135 asserts that it "does not limit or affect any other subpoena authority provided by law," but the majority opinion describes a nonstatutory "warrant," not subpoena authority.

 See Wis. Stat. § 968.36(5).

 See, e.g., State v. Baltes, 183 Wis. 545, 198 N.W. 282 (1924) (determining that when law enforcement failed to secure sworn testimony as required by the warrant statute, Wis. Stat. §§ 4839-40 (1923), the warrant was invalid for failing both the statutory and constitutional requirements); Glodowski v. State, 196 Wis. 265, 220 N.W. 227 (1928) (determining that when a search warrant was issued to search a private residence for liquor without evidence of "unlawful manufacture for sale, unlawful sale, or possession for sale, of liquor" as required by the statute, the warrant was void).

 In Meek, no statute gave magistrates the power to authorize warrants against private persons in criminal matters and no statute denied this power to magistrates. Meek, 19 Wis. at 321 (*302-303). The Meek court held that the prior common-law rules applied as a matter of statutory interpretation.